# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0645
════════════

WASSON INTERESTS, LTD., PETITIONER,

v.

CITY OF JACKSONVILLE, TEXAS, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued January 14, 2016**

JUSTICE BROWN delivered the opinion of the Court.

Texas is inviolably sovereign. *In re BP Oil Supply Co.*, 317 S.W.3d 915, 919 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (orig. proceeding).[1] Such sovereignty is inherent in its statehood, *Alden v. Maine*, 527 U.S. 706, 713 (1999), and generally protects the state from suits for money damages, *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002).[2] Political subdivisions of the state—such as counties, municipalities, and school districts—share in

---

[1] Though the United States Constitution established a system of "dual sovereignty" whereby "the States surrendered many of their powers to the new Federal Government, they retained a 'residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (Scalia, J.) (quoting THE FEDERALIST NO. 39 (James Madison)).

[2] *See also Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694–95 (Tex. 2003). Among the aspects of sovereignty Texas has retained in our nation's federal system are its "immunity and the concomitant authority to decide whether to allow private suits against [it] in [its] own courts." *Alden*, 527 U.S. at 743.

the state's inherent immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). But "[t]hey represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Payne v. Massey*, 196 S.W.2d 493, 495 (Tex. 1946). Therefore, in the realm of sovereign immunity as it applies to such political subdivisions—referred to as governmental immunity—this Court has distinguished between those acts performed as a branch of the state and those acts performed in a proprietary, non-governmental capacity. *See Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949); *City of Galveston v. Posnainsky*, 62 Tex. 118, 127 (1884).[3] Consistent with the understanding that a municipality's immunity extends only as far as the state's but no further, we have long held that "[a] municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006).

Yet, although the rationale for governmental immunity remains firmly established in our jurisprudence, we have never decided whether the distinction between governmental and proprietary acts—sometimes referred to as the proprietary-governmental dichotomy—applies to breach-of-contract claims against municipalities. *See id.* This case, involving a municipality's lease of real property to a private party, requires us to address that question. Relying on a string of cases that

---

[3] In practice—because of the governmental nature of counties and school districts—this distinction only applies to municipalities. "[A]s 'involuntary agents of the state' without the power to serve the local interests of their residents, counties have no 'proprietary' functions; all of their functions are 'governmental' in nature." *Nueces Cnty. v. San Patricio Cnty.*, 246 S.W.3d 651, 652 (Tex. 2008) (per curiam). Likewise, "a school district is purely a governmental agency and exercises only such powers as are delegated to it by the state." *Braun v. Trs. of Victoria Indep. Sch. Dist.*, 114 S.W.2d 947, 950 (Tex. Civ. App.—San Antonio 1938, writ ref'd). Like counties, school districts "perform[] no proprietary functions which are separate and independent of [their] governmental powers." *Id.*

2

emerged in the wake of *Tooke*, the court of appeals held that this dichotomy does not extend to the contract-claims context. And so the court of appeals held that in a breach-of-contract action, a city has immunity from suit for proprietary acts.[4] We disagree and reverse. However, because the court of appeals did not address whether the lease contract was entered into in the city's proprietary or governmental capacity, we remand this case to the court of appeals for further proceedings consistent with this opinion.

## I

In the 1990s, the Wassons assumed an existing 99-year lease of lakefront property owned by the City of Jacksonville. The lease specifies, among other things, that the property is to be used for residential purposes only. While they initially lived on the property, in 2009, the Wassons moved and conveyed their interest in the lease to Wasson Interests, Ltd. ("WIL"). WIL then began renting the property for terms of less than one week—apparently a violation of the lease terms. The city responded by sending WIL an eviction notice. Shortly thereafter, however, the city and WIL entered into a reinstatement agreement which required WIL to cease and desist all commercial activity in violation of the lease. The agreement allowed WIL to lease to families and small groups if the lease was for thirty or more days.

Nevertheless, in 2011, contending that WIL's use of the property violated the reinstatement agreement, the city sent WIL yet another eviction notice. WIL sued for breach of contract, seeking injunctive and declaratory relief. Following discovery, the city filed a combined motion for

---

[4] When the government contracts with private citizens, it waives immunity from liability, but not its immunity from suit. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997). This case deals with the latter.

3

traditional and no-evidence summary judgment on several grounds, including governmental immunity. The trial court granted the motion without comment. WIL appealed, attacking both the traditional and no-evidence summary-judgment grounds.

The court of appeals affirmed based on governmental immunity. *Wasson Interests, Ltd. v. City of Jacksonville*, No. 12-13-00262-CV, 2014 WL 3368413, at *3–4 (Tex. App.—Tyler July 9, 2014) (mem. op.). Following the San Antonio court of appeals' recent opinion in *City of San Antonio v. Wheelabrator Air Pollution Control, Inc.*, 381 S.W.3d 597 (Tex. App.—San Antonio 2012, pet. denied), the court of appeals rejected WIL's argument that the proprietary-governmental dichotomy applied in the contract-claims context. *Wasson*, 2014 WL 3368413, at *2–4 (noting that the "supreme court has never held that the [proprietary-governmental dichotomy] determines whether immunity from suit is waived for breach[-]of[-]contract claims."). The court of appeals instead held that immunity is the "default position" in contract cases. *Id.* at *3. Therefore, as immunity was the default position and the court of appeals found no waiver, it affirmed the trial court's summary judgment. *Id.* at *3–4. WIL appealed, arguing that the proprietary-governmental dichotomy does extend to the contract-claims context. We granted review to resolve that question.

**II**

**A**

Two years after Texas joined the Union, this Court recognized the doctrine of sovereign immunity: "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). This common-law doctrine—"inherent in the nature of sovereignty," THE FEDERALIST NO. 81 (Alexander

Hamilton)—"initially developed without any legislative or constitutional enactment," *Reata Constr. Corp.*, 197 S.W.3d at 374. *See also Bd. of Land Comm'rs v. Walling*, Dallam 524, 525 (Tex. 1843) ("That it is one of the essential attributes of sovereignty not to be amenable to the suit of a private person without its own consent has grown into a maxim, sanctioned as well by the laws of nations as the general sense and practice of mankind.").

Yet despite being "an established principle of jurisprudence in all civilized nations," *Beers v. Arkansas*, 61 U.S. 527, 529 (1857), the stated reasons for immunity have changed over time. The theoretical justification has evolved from the English legal fiction that "[t]he King can do no wrong,"1 WILLIAM BLACKSTONE, COMMENTARIES *246,[5] to "accord[ing] States the dignity that is consistent with their status as sovereign entities," *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002), to "protect[ing] the public treasury," *Taylor*, 106 S.W.3d at 695. Regardless of which justification is most compelling, however, it is firmly established that "an important

---

[5] That the King could do no wrong did not mean that "every thing transacted by the government was of course just and lawful," but rather that "whatever is exceptionable in the conduct of public affairs is not to be imputed to the king, nor is he answerable for it personally to his people." BLACKSTONE, *supra* at *246. "The King" was not a person—but an immortal office "created for the benefit of the people"—and English law did not impute the wrongs of the individual to the office. *Id.* In other words, because the King (the sovereign) was created *for* the people, the law deemed that he could not act *against* the people. *See id.* Moreover, in the English feudal system, "no lord could be sued by a vassal in his own court, but each petty lord was subject to suit in the courts of a higher lord. Since the King was at the apex of the feudal pyramid, there was no higher court in which he could be sued." *Nevada v. Hall*, 440 U.S. 410, 414–15 (1979). And although the King was not considered above the law, "it would [have been] a logical anomaly for the King to issue or enforce a writ against himself" in his own courts. *See* Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 HARV. L. REV. 1, 3 (1963). *This* aspect of "the King can do no wrong" appears to be the origin of modern sovereign immunity. Under the English system, the King was immune from suit absent his consent. But—at least in theory—this did not mean that the King could flout the law: "it was admitted that the king, as the fountain of justice and equity, could not refuse to redress wrongs when petitioned to do so by his subjects." 9 SIR WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 8 (3d ed. 1944). Thus, "the expression 'the King can do no wrong' originally meant precisely the contrary to what it later came to mean. 'It meant that the king must not, was not allowed, not entitled, to do wrong . . . .'" Jaffe, *supra* note 5, at 4 (citations omitted).

purpose [of immunity] is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments." *Tooke*, 197 S.W.3d at 332.

Aside from the substance of the common-law roots of immunity, the very fact that it has developed through the common law—and has remained there—has important implications. Namely, as the arbiter of the common law, the judiciary has historically been, and is now, entrusted with "defin[ing] the boundaries of the common-law doctrine and . . . determin[ing] under what circumstances sovereign immunity exists in the first instance." *See Reata*, 197 S.W.3d at 375; *see also Houston Belt & Terminal Ry. v. City of Houston*, ___ S.W.3d ___ n.1 (Tex. 2016); *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 592 (Tex. 2001) (Hecht, J., concurring) ("The common-law rule of immunity in Texas was the judiciary's to recognize, and it is ours to disregard."). In doing so, of course, we take as guides both the nature and purposes of immunity. We are also mindful that "the pragmatic rationale supporting this immunity . . . helps to delineate its limits." *Houston Belt*, ___ S.W.3d at ___.

But while the judiciary prunes and shapes the doctrine of immunity, its roots remain secure within the sovereign. Thus, because the doctrine dictates that a sovereign may not be sued "without her consent," *Hosner*, 1 Tex. at 769, we generally defer to the sovereign will *of the state*—as expressed by "the people"—for any waiver of *already existing* immunity. *See Tooke*, 197 S.W.3d at 332; *see also* TEX. CONST. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit."). "In Texas, the people's will is expressed in the Constitution and laws of the State," and thus "to waive immunity, consent to suit must ordinarily be found in a constitutional provision or legislative enactment." *Taylor*, 106

6

S.W.3d at 695. Consistent with the doctrine's well-established roots, we have ordinarily "deferred to the Legislature to waive sovereign immunity from suit, because this allows the Legislature to protect its policymaking function." *IT-Davy*, 74 S.W.3d at 854; *see also Taylor*, 106 S.W.3d at 695; *Fed. Sign*, 951 S.W.2d at 409. And, in addition to the doctrinal consistency of deferring to the legislative branch to consent to suit via waiver of immunity, we have recognized other practical reasons for doing so. This is particularly true "[i]n the contract-claims context, [where] legislative control over sovereign immunity allows the Legislature to respond to changing conditions and revise existing agreements if doing so would benefit the public." *IT-Davy*, 74 S.W.3d at 854 (citing *Fed. Sign*, 951 S.W.2d at 414 (Hecht, J., concurring)); *see also Tooke*, 197 S.W.3d at 332–33.

**B**

Because sovereignty is vested in "the people" of the state, moreover, immunity does not equally attach to every act by every governmental entity or political subdivision. As a starting point, the state generally enjoys immunity for its lawful functions, which are on behalf of "the people." But, for example, when a government officer acts *ultra vires*, immunity does not protect his acts. *See Houston Belt*, ___ S.W.3d at ___. That is because acts done "without legal authority" are not done as a branch of the state. *Id.* By definition, they fail to derive their authority from the root of our state's immunity—the sovereign will. *See id.* Likewise, in the context of governmental immunity, we have distinguished between various acts of a municipality. *Gates v. City of Dallas*, 704 S.W.2d 737, 738–39 (Tex. 1986) ("Municipal corporations exercise their broad powers through two different roles[:] proprietary and governmental."); *see also Dilley*, 222 S.W.2d at 993; *Posnainsky*, 62 Tex. at 127. Acts done as a branch of the state—such as when a city "exercise[s] powers conferred on [it]

7

for purposes essentially public . . . pertaining to the administration of general laws made to enforce the general policy of the state"—are protected by immunity. *See Posnainsky*, 62 Tex. at 127; *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011) ("*When performing governmental functions*, political subdivisions derive governmental immunity from the state's sovereign immunity." (emphasis added)).

But a city is not a freestanding sovereign with its own inherent immunity.[6] *See City of Galveston v. State*, 217 S.W.3d 466, 478 (Tex. 2007) (Willett, J., dissenting) ("[W]e have repeatedly held that a city has no immunity of its own but is afforded the State's immunity when acting as the State's agent and performing governmental functions for public benefit."); *Reynolds v. Sims*, 377 U.S. 533, 575 (1964) ("Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities."). Acts that are proprietary in nature, therefore, are not done as a branch of the state, but instead "for the private advantage and benefit of the locality and its inhabitants." *Posnainsky*, 62 Tex. at 127; *see also Gates*, 704 S.W.2d at 739 ("Proprietary functions are those functions performed by a city, in its discretion, primarily for the benefit of those within the corporate limits of the municipality."). Like *ultra vires* acts, acts performed as part of a city's proprietary function do not implicate the state's immunity for the simple reason that they are not performed under the authority, or for the benefit, of the sovereign. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth (FWISD)*, 22 S.W.3d 831, 840 n.12 (Tex. 2000) ("[A] city is deemed an

_____

[6] This is true for both home-rule and general-law cities—all Texas cities possess only *derivative* sovereignty. *See* TEX. CONST. art. XI, §§ 4–5; *see also City of Galveston*, 217 S.W.3d at 469 (majority op.) (Home-rule cities "*derive* their powers from the Texas Constitution, not the Legislature," and "have 'all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter'"; among the derivative powers of a home-rule city is "immunity from suit for *governmental* functions." (emphasis added)).

agent of the state for sovereign immunity purposes when exercising its powers for a public purpose."
(citing *Posnainsky*, 62 Tex. at 127)); *City of Houston v. Shilling*, 240 S.W.2d 1010, 1011–12 (Tex.
1951) ("[T]he [governmental function] exemption of a governmental agency from liability pertains
only to those acts or functions which are performed as the agent of the state in furtherance of general
law for the interest of the public at large . . . .").

### III

In this case, the parties disagree as to whether this proprietary-governmental dichotomy applies to contract claims. The city argues that our recent decision in *Tooke* established a "default rule" of immunity, and so this common-law distinction between proprietary and governmental acts has no application to a breach-of-contract action. Thus, the city essentially argues—and the court of appeals agreed—that a city is *never* subject to suit for contract claims unless there is a legislative waiver. The city also argues that the dichotomy is not workable and is otherwise not well-suited to the contract-claims context. On the other hand, WIL contends that there is little, if any, reason to limit this proprietary-governmental dichotomy to the torts-claims context: the rationale behind immunity and for the dichotomy should naturally guide this Court to apply the doctrine in both the contract- and tort-claims contexts, and no legislation or precedent should steer us to conclude otherwise. We agree with WIL and conclude that the dichotomy applies in the contract-claims context.

### A

We start by noting our disagreement with the court of appeals' interpretation of *Tooke* as establishing a new default rule of immunity. As a general matter, the court of appeals is correct to

9

say that the judiciary defers to the legislature to *waive* immunity—indeed, *Tooke* says as much. *See Tooke*, 197 S.W.3d at 332–33. But *Tooke* says little else as it relates to the dichotomy and certainly does not eliminate the judiciary's common-law function of determining whether immunity exists in the first instance. As to the dichotomy, in *Tooke* we said that

> [a] municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions. But we have never held that this same distinction determines whether immunity from suit is waived for breach of contract claims, *and we need not determine that issue here*.

*Id.* at 343 (emphasis added).[7] In other words, in *Tooke* we simply declined to address whether the dichotomy applied because to do so was unnecessary in that case. *See* 197 S.W.3d at 343. Instead, we resolved the proprietary-governmental dichotomy issue in *Tooke* by determining that the function at issue was governmental. *Id.* at 343–44.[8] *Tooke* did not purport to instruct whether the dichotomy applies in the contract-claims context, and we do not read it as doing so.

---

[7] In *Tooke*, after noting that we had never held the dichotomy applies in the contract-claims context, we *cf.* cited to *Gates*, 704 S.W.2d at 738–39, where we had said (but not held) that "[c]ontracts made by municipal corporations in their proprietary capacity have been held to be governed by the same rules as contracts between individuals," and that a city that contracts in its proprietary capacity is "'clothed with the same authority and subject to the same liabilities as a private citizen.'" *Id.* (quoting *Boiles v. City of Abilene*, 276 S.W.2d 922, 925 (Tex. Civ. App.—Eastland 1955, writ ref'd)). Simply put, we meant what we said in *Tooke*; namely that, until then, we had not directly decided whether the dichotomy applied in the contract-claims context. And because we did not have to decide the issue, we chose not to. Thus, the court of appeals in *Wheelabrator*, which the court of appeals in this case cited as authority, incorrectly concluded that *Tooke*'s use of a *cf.* cite "put[] *Gates* into question." *See* 381 S.W.3d at 604.

[8] The courts of appeals addressing this issue have split on the meaning of this passage from *Tooke*. *Compare City of Georgetown v. Lower Colo. River Auth.*, 413 S.W.3d 803, 812 (Tex. App.—Austin 2013, pet. dism'd) ("conclud[ing] that the proprietary-governmental dichotomy does apply to contract claims under the common law"), *with Wheelabrator*, 381 S.W.3d at 603–05 (holding that *Tooke* created a default presumption of governmental immunity and thus the dichotomy does not apply to contract claims) and *Republic Power Partners, L.P. v. City of Lubbock*, 424 S.W.3d 184, 193 (Tex. App.—Amarillo 2014, no pet.) ("Finding . . . *Wheelabrator* to be convincing [and] extend[ing] that ruling to find immunity does apply to claims arising from the breach of an express contract arising out of the performance of a proprietary function.").

Rather than attempting to divine some hidden holding from our opinion in *Tooke*, we find that the issue of whether the dichotomy applies in the contract-claims context is best resolved by a proper understanding of the closely related yet distinct roles of the judiciary and legislature concerning sovereign immunity, as well as the relation between sovereign immunity and municipalities. Our caselaw, discussed above, prescribes a relatively simple two-step process for addressing the applicability of immunity. The judiciary determines the applicability of immunity in the first instance and delineates its boundaries. *See Reata*, 197 S.W.3d at 375. If immunity is applicable, *then* the judiciary defers to the legislature to waive such immunity. *See Tooke*, 197 S.W.3d at 332–33.

Although the absence of immunity on the one hand and waiver of immunity on the other are analytically distinct, and each is left to a different branch of government, we have recognized that the "distinction is a fine one, as waiving immunity or finding it nonexistent have precisely the same effect." *City of Galveston*, 217 S.W.3d at 471. We have therefore cautioned that "[d]ue to the risk that the latter could become a ruse for avoiding the Legislature, courts should be very hesitant to declare immunity nonexistent in any particular case." *Id.* And so, while we dutifully safeguard our common-law function of determining immunity's applicability and boundaries, in so doing we keep in mind the policy preferences that the legislature has expressed. *Cf. IT-Davy*, 74 S.W.3d at 854.

**B**

The city argues that the proprietary-governmental dichotomy is ill-suited to the contract-claims setting for three primary reasons. First, the city argues that applying the dichotomy in the contract-claims context would run counter to the purposes of immunity. Second, the city contends

11

that Chapter 271 of the Local Government Code, which waives immunity for municipalities in certain contract claims, expresses a legislative policy choice that cities should, as a default, have immunity unless Chapter 271 applies. And third, the city argues that the dichotomy is otherwise unworkable in the contract-claims context. We address each argument in turn.

**1**

The city argues that the dichotomy is an ill-suited tool in the contract-claims context due to the nature of contracts and purposes of immunity. However, for more than 130 years, Texas courts have held that governmental immunity protects a city's governmental, but not its proprietary, functions. *See Posnainsky*, 62 Tex. at 127. In the tort-claims context, this distinction has been clearly established, both by this Court and by legislative recognition. *See City of Tyler v. Likes*, 962 S.W.2d 489, 501 (Tex.1997); *Dilley*, 222 S.W.2d at 993; *Posnainsky*, 62 Tex. at 127; Tex. Civ. Prac. & Rem. Code § 101.0215 (the Texas Tort Claims Act, or "TTCA"). In the contract-claims context, however, "we have never *held* that this same distinction" applies, nor has the legislature explicitly recognized its applicability. *Tooke*, 197 S.W.3d at 343 (emphasis added). Yet, notably, we have previously *recognized* the dichotomy in the contract-claims context, *Gates*, 704 S.W.2d at 739, and—at least before *Tooke*—the Texas courts of appeals unanimously applied the dichotomy in that context, albeit often without analyzing whether it should apply.[9] Therefore, despite no clear application of the dichotomy in the contract-claims context by this Court, the doctrine's applicability is well-established in our state's jurisprudence.

---

[9] There appeared to be no question, until recently, that the dichotomy applied in both the contract- and tort-claims context; thus, the lack of analysis is unsurprising. *See City of Georgetown*, 413 S.W.3d at 810 n.4 (collecting cases).

And not without reason—applying the dichotomy in the contract-claims context makes sense. The distinction between governmental and proprietary functions is premised on the derivative nature of governmental immunity. The state's immunity is inherent in its sovereignty, *Alden*, 527 U.S. at 713; cities, on the other hand, derive their immunity from the state, *Williams*, 353 S.W.3d at 134. As a result, a city's immunity can extend as far as the state's immunity but no further. We have therefore consistently said—at least in the tort-claims context—that a city is cloaked in the state's immunity when it acts as a branch of the state, but *only* when it acts as a branch of the state. *See Tooke*, 197 S.W.3d at 343; *Gates*, 704 S.W.2d at 739; *Posnainsky*, 62 Tex. at 127. When a city performs discretionary functions on its own behalf, it ceases to derive its authority—and thus its immunity—from the state's sovereignty. *See FWISD*, 22 S.W.3d at 840; *Shilling*, 240 S.W.2d at 1011–12; *see also City of Galveston*, 217 S.W.3d at 478 (Willett, J., dissenting). Such proprietary functions, therefore, do not stem from the root of immunity that is "the people," and lacking that common root, they cannot be performed as a branch of the state. Nothing in this rationale inherently limits the dichotomy's application to tort claims.

Considering immunity's pragmatic purpose—"to shield the public from the costs and consequences of improvident actions of their governments"—does not change this conclusion. *See Tooke*, 197 S.W.3d at 332. By definition, a city's "proprietary functions are those conducted 'in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government.'" *Id.* at 343 (quoting *Dilley*, 222 S.W.2d at 993). Like *ultra vires* acts, for which government officers do not enjoy immunity, a city's proprietary functions are not performed under the authority or for the benefit of the state, and thus such functions do not share a common root with

the state's sovereign immunity. *See Houston Belt*, ___ S.W.3d at ___. In the *ultra vires* context, we have noted that "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). While *ultra vires* acts are distinct from a city acting in its proprietary function, the rationale for not extending immunity is similar: because a city's proprietary functions are not done pursuant to the will of "the people," protecting them via the state's immunity is not an efficient way to ensure efficient allocation of *state* resources. *Cf. id.*[10]

**2**

But whether it makes sense to apply the dichotomy as a common-law matter is not the end of our inquiry. In support of its argument that the dichotomy does not—or at least should not—apply in the contract-claims context, the city argues that the legislature has abrogated, or at least failed to incorporate, the dichotomy. Relying on *Wheelabrator*, the city argues that the waiver of immunity in Chapter 271 of the Local Government Code is the *only* way a city may be sued for breach of contract. *See Wheelabrator*, 381 S.W.3d at 605; *see also Republic Power Partners*, 424 S.W.3d at 194 ("there is but one route to the courthouse for breach-of-contract claims against a governmental entity, and that route is through section 271.152."). WIL counters that while Chapter 271 *waives* immunity in contract claims without regard to whether the claim arose from a governmental or proprietary function, it does nothing to change or modify the common-law bounds of governmental

---

[10] Moreover, as compared to tort liability, a city can better control potential contract liability, either by refusing to enter into risky contracts or contractually limiting its liability. Thus, it makes little sense to apply the dichotomy to the tort-claims context (thereby exposing the city to expansive tort liability) but not to the contract-claims context.

immunity, including the application of the dichotomy, in the contract-claims context. Section 271.152 provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE § 271.152. The statute defines "[c]ontract subject to this subchapter" as "a written contract . . . for providing goods or services to the local governmental entity." *Id.* § 271.151(2)(A). Therefore, generally, contracts for land leases—such as the contract at issue here—are not covered by Chapter 271.

From the outset, however, it is clear that Chapter 271 does not abrogate the common-law dichotomy. As abrogation of the common law is "disfavored," we will construe Chapter 271 as abrogating the common-law dichotomy only "if there exists a clear repugnance" between the two. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802 (Tex. 2010) (internal quotation marks omitted). There is no clear repugnance here: the dichotomy is applied to determine whether there is immunity *in the first instance*, while Chapter 271 acts to waive *already existing* immunity in certain circumstances.

However, that there is no clear repugnance does not mean that Chapter 271 is irrelevant to our inquiry. Because we are "very hesitant to declare immunity nonexistent," we carefully consider the statutory landscape before doing so. *See City of Galveston*, 217 S.W.3d at 471. In this vein, the city argues that Chapter 271's failure to incorporate the dichotomy should cause us to defer to what the city implies was an intentional omission by the legislature. But—as the city itself argues—we

15

ascertain the legislature's intent "from what it enacted." *See Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). Chapter 271 neither expressly nor impliedly purports to supplant or alter the common-law dichotomy. The legislature does not alter major areas of law "in vague terms" or no terms at all—"it does not, one might say, hide elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.). And so, contrary to what some courts of appeals have reasoned, Chapter 271's failure to mention the common-law dichotomy cannot reasonably be read as disapproving of its application in the contract-claims context. *Cf. Wheelabrator*, 381 S.W.3d at 605 ("The Legislature easily could have included the . . . dichotomy it used in the tort-claims context in the contract-claims scheme, but chose not to do so."). From the words used in Chapter 271, it is clear that the legislature enacted a waiver of immunity in certain breach-of-contract claims. Thus, "[b]ecause [Chapter 271] contains no language intended to" supplant or alter the common-law dichotomy, "that should end the inquiry because this Court presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact." *See Ruttiger*, 381 S.W.3d at 452. Chapter 271, in sum, does not counsel us to abandon the dichotomy in the contract-claims context.

**3**

Finally, in arguing that the dichotomy was created exclusively for the tort-claims context, the city suggests that the dichotomy itself is unworkable, citing several U.S. Supreme Court opinions. *See, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545–46 (1985); *City of Trenton v. New Jersey*, 262 U.S. 182, 191–92 (1923). These opinions point out the difficulty in determining

16

whether a function is proprietary or governmental, and thus they question whether such a dichotomy is a judicially manageable standard. *See Garcia*, 469 U.S. at 545 ("The goal of identifying 'uniquely' governmental functions . . . has been rejected by the Court in the field of governmental tort liability in part because [it] is unmanageable."); *Indian Towing Co. v. United States*, 350 U.S. 61, 64–68 (1955) (noting "the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations"); *see also City of San Antonio v. Winkenhower*, 875 S.W.2d 388, 392 (Tex. App.—San Antonio 1994, writ denied) (noting the persuasiveness of the city's argument "that the classification of certain activities as proprietary under common law is anachronistic in light of the expanded role [of] government in recent decades.").

We, too, have recognized "[t]he distinction has not been a clear one," as determining which functions are proprietary and which are governmental is not always a cut-and-dried task. *See Tooke*, 197 S.W.3d at 343. Yet, importantly, our state constitution authorizes the legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." TEX. CONST. art. XI, § 13(a). In the tort-claims context, the legislature has exercised that authority by enacting the TTCA, which defines specific functions as proprietary or governmental. *See* CIV. PRAC. & REM. CODE § 101.0215. The TTCA generally defines governmental functions as those "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id.* § 101.0215(a). It then provides a non-exhaustive list, enumerating thirty-six legislatively-defined governmental functions. *Id.* Proprietary functions, on the other hand, are generally defined by the

TTCA as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality, including but not limited to [three specific functions]." *Id.* § 101.0215(b).

Such democratic enactments—representing the will of the people—fatally undercut the city's argument that workability concerns should discourage us from applying the dichotomy in the contract-claims context. While such a dichotomy may at times be difficult to apply, the Texas judiciary has been doing so for more than 130 years. Moreover, and perhaps most importantly, the legislature has provided definitional tools to aid our inquiry. *See* CIV. PRAC. & REM. CODE § 101.0215. Although the TTCA was enacted with the tort-claims context in mind, we see no reason its definitional guidance cannot or should not also apply in the contract-claims context. *See Tooke*, 197 S.W.3d at 343–44. In determining the boundaries of immunity as it relates to whether a function is proprietary or governmental, therefore, courts should be guided—as we are today—by the TTCA's treatment of the proprietary-governmental distinction.

\* \* \*

In sum, sovereign immunity does not imbue a city with derivative immunity when it performs proprietary functions. This is true whether a city commits a tort or breaches a contract, so long as in each situation the city acts of its own volition for its own benefit and not as a branch of the state. We therefore hold that the common-law distinction between governmental and proprietary acts—known as the proprietary-governmental dichotomy—applies in the contract-claims context just as it does in the tort-claims context. Because the court of appeals below held otherwise, we reverse. However, as the court of appeals affirmed summary judgment by holding that the proprietary-governmental

18

dichotomy did not apply, it did not address whether the contract at issue was proprietary or governmental, nor did it address the city's alternate grounds for summary judgment.[11] Accordingly, we remand this case to the court of appeals to address those questions in the first instance.

 

 

 

_____

Jeffrey V. Brown
Justice

OPINION DELIVERED: April 1, 2016

---

[11] "When a trial court's order granting summary judgment does not specify the grounds relied upon," as here, "the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).