# Supreme Court of Texas

No. 21-0307

City of League City, Texas,
*Petitioner*,

v.

Jimmy Changas, Inc.,
*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

JUSTICE YOUNG, concurring.

It should not be so hard for a citizen of Texas to know the answer to the following question: "If I make a contract with a city and it breaches the contract, will the courts vindicate my claim?" The response, alas, will often boil down to this: We won't know until six or seven years after the breach, at which point the courts will have balanced some factors and parsed a statute limited to torts. At that point, either all will be well, or else it will be a total loss. "But good luck," a lawyer might tell a client, "and here's my bill."

Such a conversation may well have happened in this case many years ago when the contractual negotiations were underway—not so long ago, but long enough that our leading immunity cases were not even

on the books. Those cases, as the Court today ably explains, require us to determine whether a municipality's challenged action was either governmental or proprietary. In making that determination, we are supposed to ask (1) whether the classifications listed in § 101.0215(a) of the Texas Civil Practice & Remedies Code provide any "guidance," and if not, (2) whether the action otherwise meets the common-law definition of "governmental function," as expounded through the four *Wasson* factors. No party has asked us to reassess our prior decisions, and I agree with the Court that, under the rather meandering process that those precedents compel, League City has failed to show that its contract with Jimmy Changas satisfies either inquiry.

I suspect, however, that the City could not satisfy *any* reasonable standard to immunize itself from Jimmy Changas' claim. I thus write separately because it is not clear to me that we are even asking the right questions in this breach-of-contract context. This area of law has long bedeviled us, and I do not propose to solve all of it today. Instead, my goal is to discuss how we got here, propose a way to distinguish between governmental and proprietary contracts that would simplify many cases, and suggest that, in an appropriate future case, it is not too late for us to systematically reconsider our precedents.

**I**

Many of the cases that the Court cites today were built on substantial confusion and fundamental disagreement about the nature of immunity and how it relates to breach-of-contract claims. Unfortunately, but perhaps predictably, that confusion and disagreement have grown into an analytical framework derived from two very different

2

legal standards—one from a statute and the other from common law.  I doubt the relevance of the former and the correctness of our current understanding of the latter.

## A

Start with the first step—the statutory one.  There, our current practice is to consult the Texas *Tort* Claims Act to determine whether a municipality is entitled to immunity for *contract* claims.  *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a)–(b).

Why would we do such a thing?  Certainly not because the statute commands it.  To the contrary, we are fully aware that the Act's "statutory definitions and designations apply expressly to tort claims," *Wasson Ints., Ltd. v. City of Jacksonville (Wasson II)*, 559 S.W.3d 142, 146 (Tex. 2018), "but *not* for claims for breach of contract," *ante* at 6 (emphasis added).

The statute's tort limitation is just the most obvious of several reasons that make it problematic to apply its "governmental functions" list in the contract context.  I will start there by adding that the statutory limitation was no accident.  Since 1987, our Constitution has expressly authorized the legislature to "define *for all purposes* those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." Tex. Const. art. XI, § 13 (emphasis added).  Despite that broad "all purposes" authority, the legislature cabined its definitions to *tort claims* that same year.  *See* Act of Sept. 2, 1987, 70th Leg., 1st C.S., ch. 2, § 3.02, 1987 Tex. Gen. Laws 37, 47–48 (codified at Tex. Civ. Prac. & Rem. Code § 101.0215(a)).[1]

---

[1] I readily accept for this case and in general that our precedent makes

3

To be clear, when the legislature acts in ways that displace the common law—which is typically within its power and something our Constitution specifically invites here—the courts' duty is to follow the legislative choice. Indeed, as a general matter, today's judiciary should be extremely cautious about using its common-law authority to innovate in areas where the legislature has been particularly active. *See Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 157–59 (Tex. 2022) (Young, J., concurring); *Am. Nat'l Ins. Co. v. Arce*, __ S.W.3d __, 2023 WL 3134718, at \*17 (Tex. 2023) (Young, J., concurring).

The circumstances before us today, however, are exactly the opposite. The legislature had clear authority to displace the common law and unambiguously exercised it, but *only as to torts*. We must credit the legislature with acting purposefully, and as a "text-centric Court," *Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 441 (Tex. 2011) (Willett, J., concurring), I cannot help but think that we should draw a very different lesson from the legislature's choice: that it intended *not* to displace the common law with respect to contract claims against municipalities. The legislature could have made the Tort Claims Act list fully applicable in any or every context, but instead unambiguously limited it. I would

---

the governmental-or-proprietary distinction dispositive. The Court is quite right that this distinction is longstanding for *tort* claims. *Ante* at 7 n.3. But as I note below, no comparable history undergirds its use in *contract* claims. We first suggested it just *seven years ago*. *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 439 (Tex. 2016) ("[W]e have never decided whether the distinction between governmental and proprietary acts . . . applies to breach-of-contract claims against municipalities."). The ink is barely dry. Whether there are *additional* grounds that might justify or require finding that governmental immunity does not apply to a governmental unit in the contract context is an interesting question that goes beyond the scope of my opinion today.

respect that limitation until the legislature says otherwise. A patient should not take a pill with breakfast or lunch when the doctor prescribed one at dinner; a court should not expand a law's scope to an area its text expressly refuses to reach. In neither context is *more* necessarily *better*.

A second reason to respect the textual limitation (although, in truth, the first should be enough) is that the legislature's choice to leave the common-law process intact in the contract context is quite sound. A laundry list of governmental (and thus immunized) functions for tort claims—and only tort claims—makes eminently good sense.[2]

Tort and contract claims, after all, are fundamentally different. Future tort liability is a matter of risk, not certainty. Whether a tort will happen, how often it will happen, and the consequences of its happening cannot truly be known—only feared. Governmental immunity for torts removes at least most liability risks for activities and projects that the legislature may wish to encourage—like city-funded "parks and zoos," "museums," "recreational facilities," "swimming pools," "parking facilities," "firework displays," Tex. Civ. Prac. & Rem. Code §§ 101.0215(a)(13), (14), (23), (25), (27), and the like. Cities are more likely to undertake such activities if the cost of doing so need not include (or at least may largely discount) the uncertain future costs that ordinary tort liability would bring. To take a (literal) concrete example: Building a swimming pool is

---

[2] More specifically, the functions listed in § 101.0215(a), which are deemed "governmental," are brought within the Tort Claims Act, meaning that immunity is also *waived*—if and to the extent the claim can survive the gauntlet that the Tort Claims Act itself imposes. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 865–69 (Tex. 2023) (describing many of the manifold procedural and substantive requirements that burden Tort Claims Act, but not ordinary, litigation).

a positive good for a community, but even responsibly done, the frequency and consequences of injuries and accidents are unpredictable. A city with limited resources may reasonably choose not to go forward when it is faced with the prospect of sudden, substantial, repeated, and enduring tort liability. That basis for hesitation, however, should be largely obviated by the statutory classification in § 101.0215(a)(23), which ensures that damages from a city swimming pool or other recreational facility will be imposed only if and to the extent the Tort Claims Act itself authorizes it.

Contracts are an entirely different matter. Unlike tort liability, contract liability can be more readily foreseen. Opening a swimming pool to the public poses a wildly different kind of liability risk than entering into a contract to install one. A city can do the latter with far more certainty and awareness of the attendant risks and potential liability. Indeed, just like any private party, a city can negotiate a contract's terms and conditions up front—and, importantly here, define or limit the remedies available to each party in the event of a breach. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("By entering into a contract, a governmental entity . . . voluntarily bind[s] itself like any other party to the terms of the agreement . . . ."); Charles Fried, *Contract as Promise: A Theory of Contractual Obligation* 1 (1981) ("The promise principle . . . is that principle by which persons may impose on themselves obligations where none existed."). Analyzing a city's entitlement to immunity for contract claims, in other words, is an inherently different endeavor than analyzing one based in tort. The incentives, mental states, foreseeability, and remedies will often differ.

6

*See, e.g.*, *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991); *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 44–45 (Tex. 1998).

For these reasons, I am not puzzled by the legislature's express limitation of its "governmental-versus-proprietary" list to suits "under this chapter"—that is, the Tort Claims Act. Tex. Civ. Prac. & Rem. Code § 101.0215(a). For the same reasons, it is not obvious to me that the Tort Claims Act can even "aid our inquiry" all that much for breach-of-contract claims. *Wasson Ints., Ltd. v. City of Jacksonville (Wasson I)*, 489 S.W.3d 427, 439 (Tex. 2016). Whatever their similarities, their differences are greater. The former cannot safely inform the latter, just as a chef unfamiliar with Texas chili should not consult his bouillabaisse recipe for guidance on the ground that both are stews.

**B**

Happily, the potential misdirection the Tort Claims Act can create when it is conscripted into service for contract cases is at least limited in its scope. As this case demonstrates, if the statute's definitions or one of its thirty-six enumerated functions cannot provide us any "guidance," we move to the second step: applying the common law.

Here, the problem is not so much *whether* the common law applies but *how* we have come to apply it.[3] To determine whether a municipality's action is governmental (and thus immunized), our cases direct us to apply a four-factor test, asking (1) whether the city's act was mandatory or discretionary, (2) whether it was for the benefit of the

_____

[3] The recognition of sovereign immunity is within the proper common-law domain of the courts. *See Wasson I*, 489 S.W.3d at 432. If the courts recognize immunity, then it is up to the legislature to waive it or not.

7

general public or only its residents, (3) whether the city was acting on its own behalf or the State's, and (4) whether the city's act, if otherwise proprietary, was sufficiently related to a governmental function. *Wasson II*, 559 S.W.3d at 150–54.

Today's case, fortunately, serves as a fairly straightforward example of how a city can flunk each factor. But that does not mean it will always be so easy. As with most multifactored tests, the *Wasson* factors can point us in different directions,[4] and I am unsure how to measure one against the other in the event of a conflict. *Cf. Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment) (likening balancing tests to "judging whether a particular line is longer than a particular rock is heavy"); *National Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1160 (2023) (opinion of Gorsuch, J.) (questioning how courts can weigh economic and noneconomic costs and benefits under the *Pike* balancing test in a dormant Commerce Clause analysis and concluding that such a balance is "insusceptible to resolution by reference to any juridical principle").

Potentially worse, counting the factors for and against could give the mistaken impression that the immunity analysis is reducible to simple arithmetic. Three against one or one against three provides only an illusion of being closer to the correct answer. These factors are, by their nature, incommensurable—a fact enjoyed perhaps only by the

---

[4] *See Wasson II*, 559 S.W.3d at 154; *see also Hayes St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 705–06 (noting that one factor supported a "proprietary" classification while the other three supported a "governmental" classification). Indeed, if a multifactored test were *incapable* of pointing in different directions, there would seem be to be no point in having more than one factor.

equivocating law student on exam day, but not by any judge, litigant, or member of the public who seeks more clarity in the law.[5]

To be sure, *Wasson II* instructs that when "some factors . . . point to one result while others point to the opposite result," we "should consider immunity's nature and purpose and the derivative nature of a city's access to that protection."  559 S.W.3d at 154.  I must confess, however, that I do not quite know what that statement means or what rule of decision it provides for our trial judges, who must make the legal call in the first instance.  More importantly, I doubt that a Texan about to form a contract with a city (or a Texan who already did so and now finds that city in breach) will be able to know with much confidence whether immunity applies or not.

Similarly lacking, I am afraid, is any confidence we may have in the potential answers the *Wasson* factors could produce. It seems entirely possible that even when the factors all point in the same direction, it could be the same *wrong* direction.  Consider, for instance, a city's decision to create a police force.  Jurists and laymen alike would intuitively (and rightly) regard that decision to be quintessentially governmental.  The *Wasson* factors, though, might deem such an act *proprietary*.  A city is not mandated to create a police force (factor 1); the police force would primarily benefit city residents by virtue of its limited jurisdiction, which is why the city's residents pay for it (factor 2); and

---

[5] As Justice Blacklock eloquently puts it, "When the factors themselves become the inquiry—as seems to have happened—the underlying concepts recede into the mist, and we lose sight of what we are really asking and why we are asking it." *Post* at 5–6 (BLACKLOCK, J., dissenting).  This comment applies here and to so many other areas of the law that currently rely on balancing tests.

that primary responsibility for funding its own police force, as well as its local chain of command, shows that the city would primarily be acting on its own behalf, not the State's (factor 3).[6]

One could perhaps argue (under factor 4) that a police force is "sufficiently related" to a governmental function. Relying on that escape hatch, though, only illustrates my point. It would be strange indeed to say that something is "sufficiently related" to a governmental function after it fails the first three factors of a test purporting to suss out whether it is "governmental." Relying on the last factor, in other words, is essentially circular: it openly depends on already knowing what is "governmental" to determine whether something is "governmental."[7]

I have a sneaking suspicion that the "four-factor" test turns out to be a *one*-factor test and that—*voila!*—the paramount fourth "factor"

---

[6] To be sure, this particular example assumes that I have understood factor 3 correctly. Based on our precedent, it is also unclear to me whether this factor requires us to look at the municipality's *intentions* or the *effects* of its decisions. *Compare Wasson II*, 559 S.W.3d at 151 (considering whether nonresidents benefitted from a city's decision) *with id.* (looking to the record to determine the city's "primary objective").

[7] One can easily imagine other examples where the factors mislead more than facilitate the ultimate governmental-or-proprietary inquiry. How about another classic governmental function: levying property taxes. Because the State opts not to levy such taxes, doing so is a municipal choice (factor 1). Those taxes fund municipal entities and primarily benefit their own residents, as with schools and streets (factor 2). In levying such taxes, a city could not claim to do so on behalf of the State, which does not assess property taxes, and the collected taxes do not go to the State's fisc (other than temporarily, in some cases) (factor 3). Maybe, again, the fourth factor could bat clean-up, but if so, what work do the first three achieve? How much weight should they receive in such instances? Is the fourth one doing anything other than stating "yes, this is governmental"— easy for taxes or police, but harder in other cases? If we cannot trust the first three factors in "easy" cases, why should we trust them in hard ones?

is revealed as just another disguise for our ancient nemesis: Ye Olde Know-It-When-I-See-It Test.

## C

My thoughts thus far are admittedly rather pessimistic, but I proceed mindful of Chesterton's fence. The benefit of raising these issues in *today's* case is that we can explore them without any risk of tearing down a fence that was built for a good but unknown or forgotten reason.

Nonetheless, I doubt that the status quo reflects our best ability to distinguish between governmental and proprietary in the contract context. That governmental-or-proprietary distinction, I acknowledge, has a long historical pedigree with respect to *tort* claims. *See City of Galveston v. Posnainsky*, 62 Tex. 118, 130–31 (1884). But it is of surprisingly recent vintage with respect to *contract* claims. *See Wasson I*, 489 S.W.3d at 439. Indeed, it was only nineteen years before *Wasson I* that this Court appears to have first endorsed the antecedent premise that governmental units are entitled to immunity for contract claims just as they are for tort claims. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401 (1997). I mention this not to challenge the use of the dichotomy— our precedent, as fresh as it may be, prescribes its use. Instead, while I accept it as our current precedent, I think that it probably is too early to conclude that the *only* way that immunity might be lacking in a contract case is if entering into it qualifies as a city's "proprietary" action.[8]

---

[8] This is not to mention, of course, that the legislature has already waived any local-government immunity for certain classes of contract claims. *See* Tex. Loc. Gov't Code §§ 271.151(2), .152 (waiving, for example, such immunity for contracts involving the provision of goods or services). In 2005, when the legislature enacted Chapter 271, it was unclear what immunity (if any) municipalities had for breach-of-contract claims, so the waiver avoided any

11

But for today, I proceed on the premise that the governmental-or-proprietary question will be dispositive. Given that principle, we should at least ensure that the nature of the claim does not become ultimately obscured by labels. In other words, when we begin classifying a municipality's acts as either "governmental" or "proprietary," we ought to still account for the inherent differences between tort and contract claims.

Perhaps one way to improve our current approach, as Justice Blacklock suggests, is to jettison the *Wasson* factors and simply deploy our "good judgment and practical knowledge" while applying the governmental–proprietary dichotomy. *Post* at 6. Indeed, as he sees it, regaining "a coherent theory" in this area of the law will require a more "firmly grounded" understanding of "the concepts conveyed by the words 'governmental' and 'proprietary'" and applying them accordingly. *Post* at 4. And perhaps building a common-law basis for this distinction in a series of cases will generate *rules*, not mere *factors*, that will provide the requisite clarity and predictability that the citizens and cities of Texas all deserve. I would welcome the endeavor.

That said, I cannot shake the notion that *any* rule or set of rules would characterize League City's contract with Jimmy Changas as a decidedly *proprietary* action. And so I propose a different rule: that a contract is proprietary if it asks a market participant to do the very kind of thing it could contractually bind itself to do with non-governmental market participants. The contract in this case—memorializing financial incentives to build a restaurant—reflects no material difference from a

---

consequences of the confusion. *See* H. Rsch. Org., Bill Analysis, H.B. 2039 (April 20, 2005).

potential contract between similarly situated private parties.

To test this view, suppose that Jimmy Changas' counterparty was not a governmental entity but instead a commercial developer. Such a developer might offer incentives to Jimmy Changas to build a restaurant in its development. Why? To increase the desirability and thus the value of its homes and commercial spaces, to attract other commercial tenants to a shopping plaza, to serve as an amenity for employees that would help entice companies to open an office, or for other similar reasons. I would think that such an offer (if accepted) would be a standard commercial agreement. If Jimmy Changas performed and the private developer refused to do so, we would treat the dispute as an ordinary breach-of-contract action. We would not tell Jimmy Changas that the contract was illusory and that its dedication of resources to *this* project rather than others that it might otherwise have preferred was for nothing.[9]

My dissenting colleague, on the other hand, reaches the opposite conclusion and makes a strong argument that Jimmy Changas is no more than a "participant in a government-benefits program" and a "beneficiary of government largesse, not a counterparty in a commercial exchange" "in which private parties might engage for their mutual benefit." *Post* at 7–8. As with so much else in Justice Blacklock's opinion, I largely agree with this insight, but in my view, the inquiry he describes is *antecedent* to the one on which I focus.

---

[9] Like other legal rules, future cases may be required to refine this one, were the Court ever to adopt it. For example, determining the proper level of generality to assess whether a contract with a city is analogous to one that could be made with a private counterparty might require further elaboration. But I doubt that any such difficulty would appear in *this* case, and maybe not in many others, either.

Specifically, if we determine that a "contract," despite its name, is nothing but an exercise of public spending or "largesse," that would end our inquiry. We would never reach the immunity question at all because such a relationship, even if dressed up in contractual garb, would not truly be *contractual*. Whatever arguments a beneficiary of "largesse" might make if the munificence were to dry up, those arguments would not sound in contract if there was no true contractual relationship. In such a case, as Justice Blacklock notes, we would first turn to the public law creating the government program. *Post* at 8. Other areas of law, such as the procedural due-process jurisprudence on government benefits, might well apply, too.[10]

But if we pass that antecedent step, it becomes a contract case. Here, substituting the developer in my hypothetical for League City suggests to me that Jimmy Changas was not the beneficiary of "largesse" but was engaged in commercial activity. The focus on the contractual counterparty—who will bear all the risk if a city is able to slip out of its deal—is proper. To a city, *everything* it does will seem governmental; to

---

[10] There is substantial disagreement about whether (or the extent to which) the government must follow the strictures of due process when it makes a decision regarding benefits that it is under no duty to provide—benefits that "are sometimes referred to as government largesse." John E. Nowak & Ronald D. Rotunda, *Constitutional Law* 540 (5th ed. 1995). The key question in such cases is whether these benefits constitute "property"—a question I briefly address in Part II, *infra*. For purposes of answering that question in the due-process context, the U.S. Supreme Court has circled around the concept of "entitlement," *e.g.*, *Bd. of Regents v. Roth*, 408 U.S. 564, 577–78 (1972), what some could easily transpose as a contractual promise, *e.g.*, Nowak & Rotunda, *supra*, at 542 ("[An] entitlement also may come from statutory law [or] formal contract terms . . . ."). If such entitlements can be characterized as contracts at all, it is probable that they are situated quite differently for *immunity* purposes from "contracts" of the traditional sort.

a hammer, everything seems like a nail. But it will not seem that way to a business entering into a contract (just as my thumb does not feel like a nail when my hammer strikes it).

That said, Justice Blacklock is surely correct that "[g]overnment-sponsored 'economic development' programs are no stranger to political controversy" and that newly elected officials may not want to be bound by their predecessors' policy decisions as reflected in the contracts that arise from such programs. *Post* at 3. But I disagree that the promises made and memorialized in writing by a municipality can just be undone by nothing more than the whims of the political process. The law has other ways to mitigate the profligacy of poor leadership without heaping all the consequences of a poor choice on the contractual counterparty.[11] In one statutory waiver of immunity for contract claims, for example, the legislature has chosen to enact limitations on the damages recoverable from a municipality. *See, e.g.*, Tex. Loc. Gov't Code § 271.153(a)(4)–(b)(2). Of course, *any* party to a contract may negotiate for such limitations of liability. If cities do not do so as a matter of course, nothing stops the legislature from enacting such a blanket term, whether as a default or as mandatory, for these kinds of contracts. Nor is it clear that the

___

[11] The justification for municipal power to restrict individual rights by force of law is that municipal corporations reflect local self-government. That self-government premise renders quite doubtful any wholesale immunization of municipal corporations for their leaders' improvident contractual undertakings. On the contrary, if unwise decisions generate no real consequences, the incentives for rigorous self-government cannot help but diminish. And, little by little, *wise* exercises of self-government will be punished, too; *all* local governments will have to pay more for a contract if *some* of them can renege. After all, how will a business be able to distinguish honorable municipalities whose word is their bond from those who will abandon agreements when short-term political or fiscal agendas make doing so convenient?

15

common law of government contracts would not have similar effects, allowing both parties to negotiate in the light of the law.

The upshot of all this is that if we abandon the *Wasson* factors but keep the governmental–proprietary distinction, as Justice Blacklock and I both propose, the application will look much different for contracts cases. And because many if not most of the contracts that municipalities enter into will be ones that private parties can similarly make, like the one between League City and Jimmy Changas here, those contracts will be correctly deemed proprietary and no immunity will attach. *Cf. Gates v. City of Dall.*, 704 S.W.2d 737, 739 (Tex. 1986) (noting that "proprietary functions have subjected municipal corporations to the same duties and liabilities as those incurred by private persons and corporations"). It is one thing to diffuse public goods and common resources; it is quite another to make bargained-for promises to specific entities. Differentiating between the two, I think, would be an example of "good judgment and practical knowledge of how the world works." *Post* at 6.

## II

Many additional pages could illustrate with much more detail how governmental immunity in the breach-of-contract context is far from settled (if not unsettling). Reasonable minds can and will differ on what immunity (if any) municipalities can claim in such cases. Opinions from Justices of this Court have run the gamut, ranging from a categorical immunity rule, to no immunity at all, to someplace in between.[12] I cannot

---

[12] *See, e.g.*, *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 857 (Tex. 2002) (categorical immunity rule); *Fed. Sign*, 951 S.W.2d at 418 (Enoch, J., dissenting) (no immunity at all); *id.* at 412 (Hecht, J., concurring) (some place in between).

say which is right without further consideration and briefing on the issue, of course, but given the inability of our current factor-ridden framework to generate consistent and predictable results, I doubt *stare decisis* will stand as an insurmountable barrier to a thorough recalibration of our approach. Thus, to the extent a future case asks us to reconsider our precedents, I offer a few tentative observations, intended not as any great effort to plumb the depths of this contentious and cacophonous area of the law, but instead as a modest offer of potential points of consideration if and when the occasion calls for it.

*First*, the fact that we are dealing with a municipal corporation might simplify our analysis. As a learned colleague on the federal bench recently opined, "at common law, both in England and the early American Republic, incorporated entities were not entitled to sovereign immunity." *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 191 (5th Cir. 2023) (Oldham, J., concurring).[13] Whatever the support for that (some might say) proposed federal common-law rule,[14] I find the

---

[13] Coincidentally, the full *Springboards* panel also expressed frustration with precedent that mandated—you guessed it—a multifactor-balancing test for immunity. *Compare id.*, at 179 (noting that the immunity factors derived from *Clark v. Tarrant Cny.*, 798 F.2d 736 (5th Cir 2019), have been "fairly described as having all the precision of a blunderbuss") (internal quotations and citations omitted), *with id.* at 187 (Oldham, J., concurring) (calling the factors "cumbersome" and proposing "a new single-factor test: Was the entity asserting state sovereign immunity considered 'the State' in 1789?").

[14] *Compare* Ann Woolhandler, *Interstate Sovereign Immunity*, Sup. Ct. Rev. 249, 261 (2006) ("[T]he [U.S. Supreme] Court might have treated the immunities as matters of federal constitutional or federal common law."), *with* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559, 1565–66 (2002) (positing that state sovereign immunity is a "concept . . . relevant to *personal* jurisdiction"); William Baude, *Sovereign Immunity and the Constitutional Text*, 103 Va. L. Rev. 1, 8–22 (2017) (arguing

general principle to be helpful at least as a rebuttable presumption. Municipal corporations are not remotely sovereign, of course, even as a matter of Texas common law. But just like individual human beings, corporations could be treated as such when performing roles delegated to them by the State. In such instances, if the presumption against being "the State" is rebutted, immunity would apply in the ordinary course.

*Second*, aside from what *we* have said, perhaps we should consider what *the People* have said about when the government (including the State itself) must compensate private parties: "No person's property shall be taken . . . without adequate compensation." Tex. Const. art. I, § 17. And as we have observed before, the Texas Takings Clause itself "waives immunity for suits," *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236 (Tex. 2011), and applies to all property (real or personal), *Gulf, C. & S.F. Ry. Co. v. Fuller*, 63 Tex. 467, 469 (1885). Thus, when a municipality accepts property under a contract and refuses to pay for them, such an action might amount to a raw, compensable taking.[15]

*Third*, and finally, sprinkled about our immunity opinions are various appeals to pragmatism, including that immunity should shield

---

that sovereign immunity is a "constitutional backdrop" and thus a form of common law that "can't be changed because of the properly limited nature of Articles I and III").

[15] *Cf. Fed. Sign*, 951 S.W.2d at 415 (Hecht, J., concurring) ("The State may not take property without compensation, but it may determine how its Branches will participate in deciding its contractual disputes."); John Echeverria, *Public Takings of Public Contracts*, 36 Vt. L. Rev. 517, 530 (2012) ("[I]f the government has not only impaired the contract interest but deprived the party of her contract remedy, then the party's protected interests have been destroyed and allowing the takings claim to go forward is necessary to protect those interests.").

the public from the costs of their government's "improvident actions." If "improvidence" typifies actions sounding in ordinary negligence, this rationale may make sense for torts. But as I noted above, I doubt it applies as much to a governmental entity's breach of contract.[16] A deal may turn out to be less good than hoped, but *negotiated contracts* can always have adequate foresight. A momentary lapse in judgment resulting in a tort is unlike the conscious, studied decision to make a promise—or, for that matter, to *break* one. Granting immunity to obviate the consequences of "improvident" governmental actions, then, cannot be the only answer. The public—whom we have sought to "shield"—always retains the option of not electing *improvident officials*. Judicially relieving those officials' improvidence, by contrast, means that the only party to suffer any consequences is the one who entered into the contract. No governmental unit—especially in *Texas*, where promises really matter—should be able to evade its obligations so capriciously.

*   *   *

With these observations, I respectfully concur and await another case in which the Court may appropriately revisit the principles of immunity as they apply to contract claims against municipalities.

Evan A. Young<br>
Justice

**OPINION FILED:** June 9, 2023

---

[16] We have used such reasoning several times in suits against governmental entities for breach of contract. *E.g.*, *Tooke*, 197 S.W.3d at 332; *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); *Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 121 (Tex. 2014) (Boyd, J., dissenting); *Wasson I*, 489 S.W.3d at 432.