**Affirmed in Part; Reversed in Part; Remanded; and Opinion filed November 29, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00545-CV

---

## TRI-STEM, LTD, Appellant

## V.

## THE CITY OF HOUSTON, Appellee

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-76229**

---

### O P I N I O N

In this breach-of-contract case, Tri-Stem, Ltd. appeals from a summary judgment in favor of the City of Houston. Tri-Stem contends the trial court erred in (1) granting summary judgment before addressing the City's assertion of governmental immunity, (2) denying Tri-Stem's motion for a continuance, (3) sustaining all of the City's objections to Tri-Stem's summary-judgment evidence, and (4) granting the City's summary-judgment motion. We conclude that

the trial court implicitly and correctly denied the City's assertion of governmental immunity because the City performed a proprietary function in entering into its contract with Tri-Stem. We further agree that, on this record, the trial court abused its discretion in denying Tri-Stem's motion for a continuance to allow it to obtain necessary discovery and deposition testimony. Our disposition of these two issues renders Tri-Stem's remaining issues moot. We therefore reverse the trial court's judgment and remand the case without further addressing them.

## I. BACKGROUND

The City of Houston contracted for Tri-Stem, Ltd. to audit the City's utility bills and seek refunds for past billing errors and overcharges. In Phase One, Tri-Stem would audit the bills for the City's unmetered streetlights, and in Phase Two, Tri-Stem would audit all other electric and natural-gas utility bills.

The contract required the City to pay Tri-Stem "45% of any cash refunds the City actually receive[d]" as a result of Tri-Stem's work for up to four years after the contract terminated. The City agreed to pay Tri-Stem on the basis of invoices submitted by Tri-Stem and approved by the director of the City's general services department or by the person designated by the director to administer the contract. Payment was "contingent upon the City's receipt of all Refunds described in the invoice."

The contract also contained the following express limitation of liability:

1. The City's duty to pay money to [Tri-Stem] under this Contract is limited in its entirety by the provisions of this Section.

2. The City has not appropriated and will not appropriate any funds for [Tri-Stem's] performance under this Contract. The City's obligation of payment under this Contract, if any, is limited to actual Refunds received by the City as a result of [Tri-Stem's] performance under this Contract. Unless the City receives actual Refunds, the City shall have no obligation to pay [Tri-Stem]. [Tri-Stem] must look to the actual

2

Refunds received by the City and to no other funds for the City's payment under this Contract.

The contract contained a merger clause stating that it constituted the parties' entire agreement, including all prior negotiations and understandings, and disclaiming any other express or implied covenants. The parties agreed that the contract could be amended "only by written instrument executed on behalf of the City (by authority of an ordinance adopted by the City Council)" and by Tri-Stem. The parties further agreed that the contract is subject to state and federal law and to the City's charter and ordinances.

The parties entered into the three-year contract in October 2009, then extended the contract for an additional year.

## A.     The Streetlight Litigation and the Contract's Amendment

The City's streetlights were installed, maintained, and powered by CenterPoint Energy Houston Electric, LLC ("CenterPoint"). When CenterPoint refused to refund alleged overcharges found by Tri-Stem, the City hired the law firm Beck Redden LLP to sue CenterPoint.

Beck Redden filed suit against CenterPoint in a Harris County district court ("the Streetlight Litigation"). To address the Streetlight Litigation, the City and Tri-Stem amended the contract as authorized by an ordinance adopted by the City Council. As amended, the contract distinguishes between Tri-Stem's payments based on "cash refunds" and its payments based on "cash recovery related to" the Streetlight Litigation or "related to judgments or settlements obtained through judicial or administrative processes or appeals." Under the contract as amended, the City was required to pay Tri-Stem (a) 45% of any "cash refunds" actually received by the City as a result of Tri-Stem's work, and (b) 20% of any "cash recovery" related to the Streetlight Litigation or its settlement. The amendment further

3

clarified that Tri-Stem "shall have no claim upon amounts paid to the City as reimbursement for expenses associated with the recovery, court costs or attorney's fees." Finally, the parties agreed in the amendment that Tri-Stem's compensation "shall never exceed" the stated percentages of the City's cash refunds and cash recovery.

## B.    The City's Agreements with CenterPoint

The Streetlight Litigation was not tried on the merits but was dismissed without prejudice on the ground that the Public Utility Commission of Texas had exclusive jurisdiction over the City's claims. Our sister court affirmed the judgment. *See City of Houston v. CenterPoint Energy Hous. Elec., LLC*, No. 01-11-00885-CV, 2012 WL 6644982, at *1–2 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, no pet.) (mem. op.).

Rather than relitigate the case before the Public Utility Commission, the City and CenterPoint negotiated a settlement. Tri-Stem alleges that the City reached a non-cash settlement with CenterPoint in a deal involving three agreements. In the document we will refer to as "the Audit Agreement," the City and CenterPoint released their claims against each other for, respectively, streetlight overbilling and streetlight underbilling, and they established an administrative process for auditing streetlight invoices in the future. In "the Trail Agreement," CenterPoint granted the City a revocable license to construct and maintain public hiking and biking trails on CenterPoint's property. In "the LED Agreement," CenterPoint agreed to convert the City's streetlights to more efficient LED lighting over a five-year period. Tri-Stem claims that the real estate involved in the Trail Agreement is likely worth tens of millions of dollars, and that the LED Agreement will save the City approximately $28 million per year annually, for which Tri-Stem claims a right to a $5.6 million

4

fee for the first year alone. Tri-Stem was paid nothing in connection with the Streetlight Litigation.

## C. Tri-Stem's Suit Against the City

Tri-Stem sued the City for breach of contract seeking to recover a percentage of any cash the City received under the Audit Agreement, the Trail Agreement, or the LED Agreement. Tri-Stem also sought to recover "the cash value of 20% of the [non-cash] consideration" that CenterPoint paid the City as a result of Tri-Stem's work.

Tri-Stem alleged that it had an agency relationship with the City, under which the City was bound to act in good faith and fair dealing in the performance of its contractual duties, and that the City "expressly agreed, and impliedly covenanted to only take cash recoveries and for Tri-Stem to negotiate settlements on its behalf." According to Tri-Stem, the City breached the contract by "unilaterally negotiating and accepting a non-cash settlement" of the Streetlight Litigation and by failing to pay Tri-Stem a percentage of the cash value of the non-cash recovery the City received in the settlement. Despite its allegations that the City reached a non-cash settlement with CenterPoint, Tri-Stem additionally pleaded for recovery of "20% of the $1,633,265 cash actually paid by CenterPoint."[1] Tri-Stem further asserted that it has sustained damages as a result of the City's failure to provide documents necessary for Tri-Stem to perform under Phase Two of the contract.

### 1. The City's Motion for Traditional Summary Judgment

A few weeks after the trial court issued a docket control order in Tri-Stem's suit, the City moved for traditional summary judgment. The City argued that under

---

[1] Tri-Stem's pleading does not describe the factual basis for the assertion that CenterPoint paid the City this amount.

the contract's unambiguous terms, Tri-Stem was entitled only to 20% of any cash recovery the City received in settlement of the Streetlight Litigation and to 45% of any cash refunds CenterPoint paid the City. Regarding the "cash recovery" provision of the contract, the City argued that the Audit Agreement is the only agreement concerning Tri-Stem's work that is related to the Streetlight Litigation, and because the City received no cash recovery under the Audit Agreement, it owes Tri-Stem nothing under the "cash recovery" provision of the contract. As for the contract's "cash refunds" provision, the City asserted that when it received a cash refund from a utility, Tri-Stem would invoice the City for the portion due to Tri-Stem and that the City has paid the full amount invoiced. In support of the motion, the City attached copies of its original and amended contract with Tri-Stem, the City's live pleading in the Streetlight Litigation at the time that suit was dismissed, Tri-Stem's original petition in this suit, and the Audit, Trail, and LED Agreements. The City also produced the affidavit of Gertha Ferguson, who was a management analyst in the City's general services department at the time of these events. Ferguson attested that Tri-Stem submitted invoices to the City totaling $325,654.02, which represented 45% of the cash refunds the City received, and that the City paid the full amount invoiced.

2.    *Tri-Stem's Motions for a Continuance and to Compel Discovery Responses*

Tri-Stem initially responded to the summary-judgment motion by filing motions to continue the summary-judgment hearing and to compel the City to respond to Tri-Stem's discovery requests. In a supplemental motion for continuance, Tri-Stem stated that it needed discovery to authenticate or "prove up" the City's business records, CenterPoint's business records, notes or memoranda of city council business, and correspondence. Tri-Stem also stated that it needed

6

deposition testimony on fact issues such as ascertaining the amount of cash the City received from CenterPoint.

The City then moved to stay discovery pending a ruling on the summary-judgment motion, and each side filed responses to the other's motions. The City objected to all of Tri-Stem's summary-judgment evidence except for those few exhibits that duplicated evidence the City already had offered in support of its summary-judgment motion. All of the motions, including the City's motion for summary judgment, were set for hearing at the same time.

At the hearing, the trial court granted the City's motion for summary judgment and rendered judgment that Tri-Stem take nothing by its suit. The trial court later signed additional orders denying Tri-Stem's motion for a continuance, sustaining all of the City's objections to Tri-Stem's summary-judgment evidence, and denying Tri-Stem's motion for a new trial.

## II. ISSUES PRESENTED

On appeal, Tri-Stem first contends that the trial court erred in granting the City's motion for summary judgment before addressing whether it had subject-matter jurisdiction.[2] As a subsidiary issue, Tri-Stem argues that the trial court has subject-matter jurisdiction over all of its claims, for which the City's immunity is either non-existent or has been statutorily waived. In its second issue, Tri-Stem maintains that the trial court abused its discretion in denying its motion to continue the summary-judgment hearing to allow Tri-Stem to obtain further discovery. Tri-Stem argues in its third issue that the trial court erred in sustaining all of the City's objections to Tri-Stem's summary-judgment evidence. In its fourth issue, Tri-Stem challenges the trial court's grant of the City's motion for summary judgment.

---

[2] We have reordered Tri-Stem's issues.

## III. JURISDICTION

If a trial court lacks subject-matter jurisdiction to make the challenged ruling, then the ruling is void. *See Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990) (orig. proceeding) (per curiam). And if a ruling is void, then the appellate court lacks jurisdiction to review the ruling's merits. *See Phillips v. Bramlett*, 407 S.W.3d 229, 236 (Tex. 2013) (citing *Times Herald Printing Co. v. Jones*, 730 S.W.2d 648, 649 (Tex. 1987) (per curiam)); *Waite v. Waite*, 150 S.W.3d 797, 800 (Tex. App.— Houston [14th Dist.] 2004, pet. denied). The appellate court instead must declare the ruling void or vacate it. *See Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 806 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We therefore must begin our analysis with Tri-Stem's jurisdictional arguments.

### A.     The Trial Court Overruled the Jurisdictional Challenge.

Tri-Stem first contends that the trial court erred in granting the City's summary-judgment motion without ruling on the City's challenge to the trial court's jurisdiction. Here, the City filed a motion that combined a traditional motion for summary judgment on the merits with an alternative motion for summary judgment based on governmental immunity. Regarding immunity, the City stated in its motion that the City "only requests ruling on this alternative basis for summary judgment subject to the Court's ruling on the City's Traditional Motion for Summary Judgment on the Contract." The record contains a ruling granting the City summary judgment but contains no ruling on the jurisdictional challenge.

We conclude, however, that the trial court implicitly denied the City's assertion of immunity. Governmental immunity defeats subject-matter jurisdiction, and in the absence of subject-matter jurisdiction, a trial court lacks authority to decide claims on the merits. *See Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). The trial court therefore was not permitted to reach the merits of

8

the case without first determining that it had subject-matter jurisdiction to do so. *Cf.* *Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 105 (Tex. 2014) (court is not permitted to "assume jurisdiction for the purpose of deciding the merits of the case" (quoting *Sinochem. Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotation marks omitted))).

If a trial court rules on the merits of claims for which its subject-matter jurisdiction is challenged, then the trial court has implicitly rejected those jurisdictional arguments. *See Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006). Here, the trial court did not dismiss the case for want of jurisdiction but instead rendered a take-nothing judgment on Tri-Stem's claims. By ruling on the merits of the claims, the trial court implicitly rejected the City's argument that the claims are barred by governmental immunity.

## B. Governmental Immunity Does Not Apply to Tri-Stem's Claims.

The parties have joined issue on the question of whether the trial court has jurisdiction over Tri-Stem's claims—or to restate their arguments in light of the trial court's implicit ruling, they dispute whether the trial court correctly rejected the City's assertion of governmental immunity. Tri-Stem contends that the trial court properly exercised subject-matter jurisdiction over the claims because (1) in entering into its contract with Tri-Stem, the City performed a proprietary function to which governmental immunity does not apply; and (2) even if entering into the contract was a governmental function, the City's immunity nevertheless was waived under the Local Government Contract Claims Act. *See* TEX. LOC. GOV'T CODE ANN. §§ 271.151–.160 (West 2016). The City takes the opposite position on both of these points.

An issue implicating a court's subject-matter jurisdiction presents a question of law, which we review de novo. *See In re H. S.*, 550 S.W.3d 151, 155 (Tex. 2018).

9

We begin with the question of whether immunity applies in the first place, because if it does not, then there is no question of whether immunity has been waived.

A Texas municipality's immunity is derived solely from the State of Texas, which possesses sovereign immunity. *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson I*), 489 S.W.3d 427, 429 (Tex. 2016). When a municipality performs a governmental function, it acts as a branch of the state and shares in the state's immunity, which is then called "governmental immunity." *Id.* at 429–30. Unless such governmental immunity is constitutionally or statutorily waived, a trial court lacks subject-matter jurisdiction over claims against municipalities. *Suarez v. City of Texas City*, 465 S.W.3d 623, 631 (Tex. 2015).

But not all of a municipality's actions are governmental functions. A city also may perform "proprietary functions," which are acts conducted by the city "in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (quoting *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949), *superseded by statute on other grounds*, Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 4.05, 1987 TEX. GEN. LAWS 37, 51). When a municipality acts in a proprietary, non-governmental capacity, governmental immunity does not apply. *See Wasson I*, 489 S.W.3d at 429–30. As we previously have explained, "the key difference between governmental and proprietary functions—both of which are performed by municipalities for the benefit of their citizens—is this: [g]overnmental functions are what a municipality *must* do for its citizens and proprietary functions are what a municipality *may, in its discretion, perform* for its inhabitants." *Oldfield v. City of Houston*, 15 S.W.3d 219, 226 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), *superseded by statute on other grounds as recognized in Thin Van Truong v. City of Houston*, 99 S.W.3d 204 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Thus,

10

when a city performs discretionary functions on its own behalf, governmental immunity does not apply. *See Wasson I*, 489 S.W.3d at 436.

Here, the City was not required to engage in a post-payment, private audit of the electric bills for its streetlights. These facts contrast with those in *Perry v. Greanias*, 95 S.W.3d 683, 693 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). As our sister court pointed out in *Perry*, Houston's City Charter requires the City to perform a pre-payment, internal audit before paying any debt. *See id.* ("Houston City Charter prescribes that the city controller cannot pay any debt owed by the city 'until he has audited and examined the claim and found the same justly and legally due and payable, and that the payment has been legally authorized.'" (quoting HOUSTON, TEX., CITY CHARTER art. VIII, § 3 (Act of 1905; added by amend. Oct. 15, 1913))).[3] The First Court of Appeals concluded that the city controller's performance of this advance, internal audit is a governmental function. *Id.* at 694. But when determining "whether governmental immunity applies to a breach-of-contract claim against a municipality, the proper inquiry is whether the municipality was engaged in a governmental or proprietary function *when it entered the contract*." *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson II*), No. 17-0198, __S.W.3d__, 2018 WL 4838309, at \*5 (Tex. Oct. 5, 2018) (op. on reh'g) (emphasis added). Nothing required the City to perform—or to contract for a private entity to perform—a second, post-payment audit of the City's utility bills.

The facts of the *Wasson* cases, recited in *Wasson II*, are instructive in deciding whether the City was acting in a proprietary or governmental function in contracting with Tri-Stem. In *Wasson II*, the City of Lake Jacksonville constructed Lake Jacksonville as the city's primary source of water and leased lakefront lots to private

---

[3] *See also* HOUSTON, TEX., CITY CHARTER art. IX, § 14 ("This Act shall be deemed a public Act, and judicial notice shall be taken thereof in all courts.").

parties, including the Wassons. *See id.* at *1. The lease incorporated the city's rules and regulations concerning Lake Jacksonville, and the rules barred the business use of the leased property. *See id.* The Wassons constructed a large house on the lot, assigned the lease to Wasson Interests, and began leasing the property for weddings and other events. *See id.* The city terminated its lease with Wasson Interests, which then sued the city for breach of contract and for declaratory and injunctive relief. *See id.* The trial court granted the city summary judgment based on governmental immunity, and Wasson Interests appealed. *See id.* at *2. The intermediate appellate court affirmed on the ground that the distinction between governmental and proprietary functions applies to tort claims but not to breach-of-contract claims. *See id.* The Supreme Court of Texas had reversed this ruling in *Wasson I*, explaining that the dichotomy applies to both tort and contract claims. *See id.*

On remand, the intermediate appellate court held that the contract claim arose from the city's performance of a governmental function, and the Supreme Court of Texas again granted Wasson Interest's petition for review. *See id.* The city argued that governmental immunity applied "because all of its activities constituted governmental functions, including its creation of Lake Jacksonville as a water supply, its decision to lease the property surrounding the lake, its adoption of ordinances and rules governing use of the leased property, and its attempt to enforce those rules against Wasson." *Id.* at *3. The Supreme Court rejected this reasoning, reminding the city that the question is "whether *the contract at issue* was proprietary or governmental." *Id.* at *4 (quoting *Wasson I*, 489 S.W.3d 439) (alteration in original).

In holding that the city was performing a proprietary function, the Supreme Court of Texas considered whether (a) the act of entering into the lease was mandatory or discretionary, (b) the leases were intended to benefit the general public

12

or the city's residents, (c) the city acted on the State's behalf or its own behalf in entering into the leases, and (d) the city's act in entering into the leases "was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary." *Id.* at \*5.

Regarding the first factor, the city in *Wasson II* had discretion to enter into the leases at issue but was not required to do so. *See id.* As the court explained, the city "chose to generate revenue by granting long-term leases to private parties." *Id.* at \*6. Here, the City of Houston was not required to submit its utility bills to a post-payment audit but did so on the chance that it might recapture a portion of the payments it already had made.

In evaluating the second factor, the court considered the contract's intended beneficiaries. The court clarified that "[a] city's proprietary contracts will often benefit some nonresidents, and its governmental contracts will often benefit some residents, but whether a contract *primarily* benefits one or the other will often indicate whether it is proprietary or governmental." *Id.* The *Wasson II* court held that the primary objective in leasing the properties was to raise funds for the city's budget. *Id.* Here, any refunds that Tri-Stem was able to obtain similarly were paid directly to the City of Houston. The refunds primarily benefitted the City and its residents, not the general public.

Turning to the third factor, the *Wasson II* court determined whether the city acted on behalf of the State or on its own behalf in entering into the lease. The court held that the city acted on its own behalf because (a) the decision to lease the lakefront property was discretionary, (b) the leases primarily benefitted the city's residents, and (c) no facts countered the conclusion that the city was acting on its own behalf. *Id.* at \*7. Similarly, the City of Houston's decision to contract with Tri-

13

Stem was entirely discretionary; the contract primarily benefitted Houston residents; and there is no evidence to the contrary.

The last factor in determining whether a municipality was performing a governmental or proprietary function when it entered into a contract is whether the contract was so related to a governmental function that the city's act in entering into the contract must be considered governmental. The Supreme Court in *Wasson II* rejected the intermediate appellate court's reasoning that when a municipality's action involves both proprietary and governmental elements, the entire function is governmental. *See id.* The Supreme Court instead held that "a city's proprietary action may be treated as a governmental only if it is *essential* to the city's governmental actions." *Id.* (emphasis added). Applying this rule, the court held that leasing the lakefront property was not "essential" to the city's operation or maintenance of the lake that served as the city's reservoir. *See id.* at *8. In the case before us, the City of Houston identifies no governmental function for which Tri-Stem's post-payment audit of the City's utility bills was essential.

In arguing that governmental immunity applies, the City states that its "*underlying agreement with CenterPoint* involved the provision of illumination for City roads and streets for purposes of ensuring the general welfare of the public."[4] But as the Supreme Court of Texas stated in *Wasson II*, the question for immunity purposes is "whether *the contract at issue* was proprietary or governmental." *Id.* at *4. This case is not about the City's contract with CenterPoint; it is about the City's contract with Tri-Stem.

Under the test articulated and applied in *Wasson II*, we conclude that the City performed a proprietary function in entering into its contract with Tri-Stem. Because

---

[4] Emphasis added.

governmental immunity does not apply to claims arising from a proprietary contract, the trial court did not err in implicitly denying the City's assertion of governmental immunity.

Given our disposition of this argument, we do not address the parties' contentions about waiver of immunity under the Local Government Contract Claims Act.

## IV. Denial of Tri-Stem's Motion for a Continuance

In its second issue, Tri-Stem argues that the trial court erred in denying its motion to continue the summary-judgment hearing so that it could conduct further discovery. A party requiring discovery to justify its opposition to a summary-judgment motion may file a motion, supported by affidavit, for a continuance. TEX. R. CIV. P. 166a(g); TEX. R. CIV. P. 251; TEX. R. CIV. P. 252. We review the denial of a motion for a continuance under the abuse-of-discretion standard. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). In determining whether the trial court abused its discretion in denying a request for a continuance to conduct further discovery, we consider (a) the length of time the case has been on file, (b) the materiality of the discovery sought, and (c) the movant's diligence in obtaining the discovery. *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 468 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

The case was filed on November 2, 2016, and the City moved for summary judgment on May 26, 2017—six weeks after the trial court signed the parties' agreed docket control order, two weeks after Tri-Stem's counsel noticed the deposition of the City's designated representative, and three days after the City served its objections and responses to Tri-Stem's interrogatories, requests for production, and requests for admission. When the City filed its summary-judgment motion, eleven months remained in the discovery period.

15

Tri-Stem promptly moved for a continuance to obtain discovery concerning, among other things, "[p]erformance under the contract between the City and [Tri-Stem] including how much cash, if any, the City received from Center[P]oint." In a supplemental motion for a continuance, Tri-Stem also stated that it needed discovery "to authenticate or 'prove up' numerous documents, including . . . notes or memoranda of city council business" and business records of the City and of CenterPoint. Tri-Stem pointed out that it had not yet taken a single deposition, because when Tri-Stem noticed the deposition of the City's designated representative, the City had moved to quash it. In its motion to quash, the City stated that Tri-Stem sought to depose the person or persons most knowledgeable on twenty-two topics and objected that "Houston cannot and will not investigate, identify and present a parade of witnesses in less than one month's time, *more than a year before trial*" (emphasis added). Because the City filed its objections and its motion to quash within three business days after the deposition was noticed, the deposition was automatically stayed. *See* TEX. R. CIV. P. 199.4. When the City moved for summary judgment, the motion to quash had not yet been heard.

At the same time that it moved for a continuance, Tri-Stem also moved to compel discovery. Among other things, Tri-Stem sought to compel an answer to its request for production for "[d]ocuments related to the payment to the City of approximately $1.5 million to begin the construction of hike and bike trails as part of the deal with CenterPoint." The City responded to the request only with objections.

Three days after Tri-Stem filed its motion to compel discovery and its supplemental motion for a continuance, the City moved for a protective order to stay discovery. All of the motions were set for hearing at the same time.

16

In the meantime, Tri-Stem filed a response to the summary-judgment motion. The day before the hearing, the City filed objections to all of Tri-Stem's summary-judgment evidence. The trial court denied Tri-Stem's motion for continuance, sustained the City's objections to Tri-Stem's summary-judgment evidence, and granted the City's motion for summary judgment.

On this record, we conclude that the trial court abused its discretion in failing to grant Tri-Stem's motion for a continuance. The case had been on file for less than seven months, and the discovery Tri-Stem sought concerning alleged cash payments from CenterPoint to the City as part of the settlement of the Streetlight Litigation, or "otherwise related to" the settlement, was material. Tri-Stem exercised diligence in seeking the discovery, and had in fact propounded it, but received no substantive reply. Tri-Stem also had attempted to depose the City's authorized representative and had moved to compel discovery responses, but the trial court granted the summary-judgment motion without expressly ruling on those matters.

Tri-Stem's harm from the denial of the motion for continuance is shown in the trial court's order sustaining all of the City's objections to Tri-Stem's summary-judgment evidence. Tri-Stem's evidence included a recommendation from the City's legal department that the city council adopt an ordinance approving an amended agreement for Beck Redden's legal services. The recommendation states, "By dismissing the [Streetlight Litigation], the City has, in fact, secured agreements on the hike and bike trails and LED conversion . . . . Additionally CenterPoint is contributing $1,500,000 for the creation of the initial hike and bike trails . . . ." The recommendation concludes that Beck Redden provided valuable services to the City "in connection with both the streetlight litigation and other, related matters as referenced above" and "recogniz[es] the value to the City of dismissing the streetlight litigation in order to gain other agreements from CenterPoint."

17

The City objected that the recommendation constituted parol evidence that is inadmissible to determine the meaning of the City's contract with Tri-Stem. But the recommendation was offered to show that the Audit, Trail, and LED Agreements—which were executed on the same day by the same CenterPoint employee—are related to the Streetlight Litigation. Thus, the trial court abused its discretion in sustaining that objection. The City also argued that the recommendation was not relevant, but this objection also could not reasonably be sustained. The City insists that the Trail and LED Agreements are unrelated to the settlement of the Streetlight Litigation and that the City did not pay Tri-Stem 20% of any cash recovery related to the settlement because CenterPoint paid the City nothing. But the recommendation is some evidence that all three agreements are related to the settlement of the Streetlight Litigation and that CenterPoint agreed to pay the City $1.5 million related to the settlement. It also is some evidence of a collateral or subsequent agreement for CenterPoint to pay the City $1.5 million, from which Tri-Stem received nothing. Finally, the City objected that the recommendation is hearsay, and Tri-Stem did not argue in the trial court that the document falls within any exception to the hearsay rule. Tri-Stem was denied the opportunity, however, to depose a representative of the City about the recommendation, about payments to the City by CenterPoint, and about the relationship between the Trail and LED Agreements to the settlement of the Streetlight Litigation. Thus, Tri-Stem had no opportunity to substitute sworn testimony for the unauthenticated recommendation.

Because the trial court denied Tri-Stem's request for a continuance and granted summary judgment to the City before Tri-Stem had sufficient opportunity to obtain material discovery, and in spite of Tri-Stem's diligence in seeking it, the trial court abused its discretion.

18

We sustain this issue. Because reversal and remand is required to allow Tri-Stem to conduct further discovery, Tri-Stem's remaining issues and arguments are moot.

## V. CONCLUSION

In entering into its contract with Tri-Stem, the City engaged in a proprietary function. Thus, the trial court did not err in implicitly denying the portion of the City's summary-judgment motion in which it asserted governmental immunity. We conclude, however, that the trial court abused its discretion in denying Tri-Stem's motion for a continuance to obtain necessary discovery responses and deposition testimony. Therefore, without addressing the remainder of Tri-Stem's appellate challenges, we reverse the trial court's grant of summary-judgment on the merits, and we remand the cause to the trial court for further proceedings consistent with this opinion.

/s/    Tracy Christopher
Justice

Panel consists of Justices Boyce, Christopher, and Busby.