# IN THE SUPREME COURT OF TEXAS

No. 20-0729

THE STATE OF TEXAS, PETITIONER,

v.

CHRIS HOLLINS, IN HIS OFFICIAL CAPACITY
AS HARRIS COUNTY CLERK, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued September 30, 2020**

**PER CURIAM**

Voting by mail in Texas is limited by statute to certain groups.[1] To obtain a mail-in ballot, a registered voter must assert eligibility on an application form that meets statutory requirements.[2] Election officials must make a form application produced by the Secretary of State available to voters.[3] The Harris County Clerk proposes to mail unsolicited ballot applications to all registered voters under 65 years of age, only a fraction of whom are eligible to vote by mail. Because no other election official in Texas is doing or has ever done what the Clerk proposes, his plan threatens to undermine the statutorily required uniform operation of election laws across the state. The State

---

[1] TEX. ELEC. CODE §§ 82.001–.004, 82.007. Every reference to a statutory section in this opinion is to the Election Code unless otherwise noted.

[2] §§ 84.001(a), 84.002.

[3] §§ 1.010(a), 84.012.

contends that such a mass mailing is not authorized by the Election Code. The Code contains no express authority. The issue before us is whether authority is implied.

Whether voting by mail should be restricted has been a subject of intense political debate, in this State and throughout the country. For more than a century, the Texas Legislature "has been both engaged and cautious in allowing voting by mail."[4] There are concerns that mail-in ballots can be marked fraudulently without the voters' knowledge or consent and "harvested"—returned by someone else, sometimes in bulk. There are countervailing concerns that requiring in-person voting discourages some from participating who otherwise would because it is harder and, especially in the current pandemic environment, not as safe. We, of course, take no side in these policy debates, which we leave to legislators and others. The question before us is not whether voting by mail is good policy or not, but what policy the Legislature has enacted. It is purely a question of law.

We conclude that the Election Code does not authorize the mailing proposed by the Harris County Clerk. Accordingly, we grant the State's petition for review, reverse the court of appeals' judgment, and remand the case to the trial court to issue a temporary injunction prohibiting the Harris County Clerk from mass-mailing unsolicited ballot applications to voters.

**I**

**A**

Statewide Texas elections are administered by county officials. Texas has 254 counties, more than any other state. They range in population from 134 people to over 4 million and in size

---

[4] *In re State*, 602 S.W.3d 549, 558 (Tex. 2020).

from 149 square miles to over 6,000. Texas counties are "legal subdivisions of the State",[5] "subordinate and derivative branch[es] of state government"[6] that "represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them."[7] Before a county official can take "any action," that action's "legal basis . . . must be grounded ultimately in the constitution or statutes."[8]

Texas has more than 16 million registered voters, some 2.4 million of whom reside in Harris County. Given the massive scale of Texas' elections and the variety of locations in which they take place, the Texas Legislature has prescribed in its lengthy, detailed, and comprehensive Election Code how elections must be conducted. The Secretary of State is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation" of the Code's provisions.[9]

The Legislature has made only five categories of voters eligible to vote by mail: those who expect to be absent from the county during the voting period,[10] those with a "disability" as defined by Section 82.002 and our decision in *In re State*,[11] those who will be 65 or older on election day,[12]

---

[5] TEX. CONST. art. XI, § 1.

[6] *Avery v. Midland County*, 406 S.W.2d 422, 426 (Tex. 1966), *vacated on other grounds*, 390 U.S. 474 (1968).

[7] *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex. 2016) (quoting *Payne v. Massey*, 196 S.W.2d 493, 495 (Tex. 1946)).

[8] *Guynes v. Galveston County*, 861 S.W.2d 861, 863 (Tex. 1993) (citation omitted).

[9] § 31.003.

[10] § 82.001.

[11] 602 S.W.3d 549, 559–560 (Tex. 2020).

[12] § 82.003.

3

those confined in jail at the time their application is submitted,[13] and crime victims whose addresses are confidential by law.[14] According to a printout in the record from the U.S. Census Bureau, only about 10.9% of Harris County's population is 65 or older. The parties dispute the percentage of voters who may have a disability, but the record reflects that for elections occurring since 2016, between 0.8% and 2.6% of voters who requested mail-in ballot applications marked a disability as their reason for doing so.

**B**

Before a primary runoff election held this July, the Harris County Clerk, Chris Hollins, sent an application to vote by mail to every registered voter in Harris County 65 years of age or older, all of whom were eligible to vote by mail.[15] On August 25, Hollins announced via Twitter that he would soon send an application to every registered voter in the county under age 65, even though only a small percentage would be eligible to vote by mail under the Election Code.

Two days after Hollins' Twitter announcement, on August 27, the Director of Elections for the Texas Secretary of State, Keith Ingram, sent a letter demanding that Hollins "immediately halt" his plan. Ingram asserted that Hollins' plan "would be contrary to [the Secretary of State's] guidance"; "[would] confuse voters about their ability to vote by mail"; and "could impede the ability of persons who need to vote by mail to do so" by "[c]logging up the vote by mail infrastructure with potentially millions of applications from persons who do not qualify". Ingram

---

[13] § 82.004.

[14] § 82.007.

[15] *See* § 82.003 ("A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day."). The State did not challenge this mailing, and its legality is not before us.

4

gave Hollins until noon on August 31 to announce the retraction of his plan. When Hollins refused, this lawsuit ensued.

The State sued Hollins in his official capacity, alleging that mass mailing applications would be an *ultra vires* action because the Election Code does not authorize an early voting clerk to send applications to voters who do not affirmatively request one. The litigation has been expedited at every level. The parties immediately entered into a Rule 11 agreement[16] that (i) Hollins would not send applications to voters under 65 until five days after the trial court ruled on the State's request for a temporary injunction; (ii) the State would forgo its request for a temporary restraining order; and (iii) the temporary injunction hearing would be set no later than September 9.[17] The trial court denied the State's request for a temporary injunction on September 11.

On September 18, after an expedited briefing schedule, the court of appeals affirmed.[18] The court declined to address the merits of the State's *ultra vires* claim and held instead that even if Hollins' plan would violate the Election Code, the State had not demonstrated that it would be irreparably injured by his mass-mailing applications. After being notified by the State of its intention to file a petition for review, we set an expedited schedule for briefing and oral argument, treating the State's merits brief as its petition for review.

The State's petition is granted.

---

[16] *See* TEX. R. CIV. P. 11.

[17] The agreement did not preclude Hollins from sending mail-in ballot applications to voters 65 or older, and he has already done so. Again, the legality of this mailing is not before us.

[18] ___S.W.3d___ (Tex. App.—Houston [14th Dist.] Sept. 18, 2020).

## C

To establish its right to a temporary injunction, the State must "prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim."[19] Hollins does not dispute the State's authority to bring an *ultra vires* claim to enjoin action by an early voting clerk that is not authorized by the Election Code.[20] Indeed, we have said that "[t]he rule is an elementary one that the state may maintain an action to prevent abuse of power by public officers".[21] Accordingly, only the second and third elements are at issue. We address them in turn.

Though we review an order denying a temporary injunction for abuse of discretion,[22] a lower court "has no discretion to determine what the law is."[23] Accordingly, "a clear failure by the trial court"—or the court of appeals—"to analyze or apply the law correctly will constitute an abuse of discretion".[24]

## II

The authority vested in Texas counties—and county officials—is limited.[25] "Political subdivisions of the state—such as counties, municipalities, and school districts—share in the

---

[19] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

[20] An *ultra vires* claim must be brought against a government officer in his or her official capacity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). The plaintiff must plead and prove "that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372.

[21] *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926).

[22] *Butnaru*, 84 S.W.3d at 204.

[23] *In re Francis*, 186 S.W.3d 534, 538 (Tex. 2006) (orig. proceeding).

[24] *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

[25] *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 28 (Tex. 2003) ("Though they are creatures of the Texas Constitution, counties and commissioners courts are subject to the Legislature's regulation. . . . [A]

state's inherent immunity. But they represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them."[26]

Almost a century ago, in *Foster v. City of Waco*, we restated the

> general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those *granted in express words*; second, those *necessarily or fairly implied* in or incident[] to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation—not simply convenient, but *indispensable*. *Any* fair, *reasonable*, substantial *doubt* concerning the existence of power is resolved by the courts against the corporation, *and the power is denied*.[27]

We later clarified that powers "necessarily or fairly implied" must also be indispensable.[28]

Because Hollins acts on behalf of Harris County, he possesses only those powers "granted in express words" or "necessarily or fairly implied in" an express grant—powers "not simply convenient" but "indispensable." Any reasonable doubt must be resolved against an implied grant

---

commissioners court may exercise only those powers expressly given by either the Texas Constitution or the Legislature."); *Guynes v. Galveston County*, 861 S.W.2d 861, 863 (Tex. 1993) ("[A]lthough a commissioners court may exercise broad discretion in conducting county business, the legal basis for any action taken must be grounded ultimately in the constitution or statutes." (citing TEX. CONST. art V, § 18)).

[26] *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429–430 (Tex. 2016) (cleaned up).

[27] 255 S.W. 1104, 1105–1106 (Tex. 1923) (emphases added).

[28] In *Tri-City Fresh Water Supply District No. 2 of Harris County v. Mann*, we acknowledged

> [the] general rule of judicial construction that even a normal municipal corporation has only such implied powers as are reasonably necessary to make effective the powers expressly granted. That is to say, such as are indispensable to the declared objects of the corporation and the accomplishment of the purposes of its creation. Powers which are not expressed and which are merely convenient or useful may not be included and cannot be maintained. Furthermore, where powers are granted to a municipality by specific provisions, such powers are not enlarged by general language found elsewhere in the act . . . .

142 S.W.2d 945, 947 (Tex. 1940); *see also Town of Lakewood v. Bizios*, 493 S.W.3d 527, 536 (Tex. 2016) ("As we have previously explained, however, general-law municipalities have 'only such implied powers as are reasonably necessary to make effective the powers expressly granted. That is to say, such as are *indispensable* to the declared objects of the [municipalities] and the accomplishment of the purposes of [their] creation.'" (quoting *Tri-City Fresh Water Supply Dist.*, 142 S.W.2d at 947) (alterations in *Bizios*)).

of authority. The Election Code does not expressly authorize Hollins' proposed mass mailing, and he does not argue to the contrary. Thus, the question is whether authority is implied.

Section 83.001(a) provides generally that an "early voting clerk", such as Hollins, "shall conduct the early voting in each election." Hollins argues that his duty to conduct early voting gives him the implied authority to mass-mail unsolicited ballot applications to registered voters, without regard to whether any particular voter is eligible to vote by mail. But Hollins' proposed mailing is unprecedented in Texas elections and thus cannot be said ever to have been considered necessary and indispensable. He does not argue that any other election official has ever proposed to mass-mail applications to ineligible voters. This year's election process is occurring during the COVID-19 pandemic, but Hollins has not explained why or how the pandemic has rendered inadequate the usual distribution of ballot applications on request, much less made mass mailings of unsolicited ballot applications necessary or indispensable to voting by mail. As the trial court recognized, this case turns only on the powers granted by the Legislature, not COVID-19. [29]

Hollins also relies on Section 83.001(c) to support the power he asserts. Subsection (c) explains that "[t]he clerk has the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting". A presiding judge's duties and authority are prescribed by Section 32.071: "The presiding judge is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves." However, the early voting clerk's authority to manage and control the polling

---

[29] The trial court said at the temporary-injunction hearing that "it doesn't matter if he's acting *ultra vires* because he thinks it's going to rain on that day or it's going to snow . . . . COVID is not [the] issue."

8

places where mail-in ballot applications are received and ballots are returned and counted suggests nothing about authority to mass-mail ballot applications to ineligible voters.

Hollins points to Section 1.010(a), which states that election officials to whom documents are required to be "submitted or filed shall make printed forms for that purpose, as officially prescribed, readily and timely available." But again, all election officials other than Hollins are discharging this duty in the way that they always have—by having forms on hand to distribute to voters on request. The record reflects that some election officials post ballot applications on their websites. But these postings involve no unsolicited delivery to voters. Mass mailings to people ineligible to vote by mail are neither necessary nor indispensable to early voting.

We interpret statutes according to their plain language, but in context—not isolation.[30] When considered in the context applicable to this case, these generally worded provisions do not provide authority for a county clerk to mass-mail unsolicited ballot applications.[31] Section 1.010(b), which follows directly after Section 1.010(a), provides that an election authority "shall furnish forms in a reasonable quantity to a person requesting them for the purpose of submitting or filing" them. Section 1.010(c) adds that "forms shall be furnished without charge". Section 1.010 is captioned "Availability of Official Forms." Read as a whole, the three subsections

---

[30] *See Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019) ("It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according to the language the Legislature used, absent a context indicating a different meaning or the result of the plain meaning of the language yielding absurd or nonsensical results." (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 414–415 (Tex. 2011))); *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (orig. proceeding) ("We presume the Legislature is aware of relevant case law when it enacts or modifies statutes."); TEX. GOV'T CODE § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

[31] *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (holding that a statutory provision authorizing commissioners courts to "exercise general control over all roads", when viewed together with related provisions, did "not include the power to petition a city to annex certain provisions of a given county road").

of Section 1.010 make it clear that Section 1.010(a)'s make-available requirement only grants election officials powers of the same class as those enumerated in subsections (b) and (c).[32]

Consistently, Section 84.012 provides that "[t]he early voting clerk shall mail without charge an appropriate official application form for an early voting ballot to each applicant requesting the clerk to send the applicant an application form." Hollins argues that this duty to send an application on request does not preclude him from sending applications unrequested. But that argument misses the mark. The question is what authority can be necessarily and fairly implied from the Election Code's provisions that is indispensable, and not merely convenient, for an election official to discharge his responsibilities. While Section 84.012 does not prohibit mass mailings, it expressly contemplates that ballot applications are to be requested by voters. An early voting clerk's authority to conduct early voting must be read in the context of Sections 1.010 and 84.012.[33]

Section 84.013 requires the Secretary of State to "maintain a supply of the official application forms for ballots to be voted by mail and . . . furnish the forms in reasonable quantities without charge to individuals or organizations requesting them for distribution to voters." Hollins argues that this express recognition of individuals' and organizations' distribution of ballot applications implies he has the same authority. The State argues that while voters are not likely to view an unsolicited ballot application from a private source as suggesting that they are eligible to vote by mail, they are more likely to do so when the application is from an election official.

---

[32] *Cf. id.* ("When general words . . . follow specific and particularized enumerations of powers . . . we treat the general words as limited and apply them only to the same kind or class of powers as those expressly mentioned.").

[33] *See id.*

Without resolving this difference, and confining ourselves to the text, we think the only fair inference from the Code's express recognition of private distribution of ballot applications and its silence on any official distribution is that the latter is unauthorized.

Other provisions in the Code reflect the Legislature's intent that election laws operate uniformly throughout the State, under the direction and guidance of the Secretary of State. Chapter 31 designates the Secretary of State as "the chief election officer of the state."[34] He or she "shall prescribe the design and content" of necessary forms, which "must enhance the ability of a person to understand the applicable requirements."[35] Section 31.003, titled "Uniformity," commands the Secretary to "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and [other] election laws". The Secretary must "prepare detailed and comprehensive written directives and instructions" for "the appropriate state and local authorities"[36] and "assist and advise all election authorities with regard to the application, operation, and interpretation" of election laws.[37]

The Code's text and history also reflect the Legislature's expectation that most Texans will vote in person. We recently explained that "[t]he history of absentee voting legislation in Texas shows that the Legislature has been both engaged and cautious in allowing voting by mail",[38] and

---

[34] § 31.001(a).

[35] § 31.002(a).

[36] § 31.003.

[37] § 31.004(a).

[38] *In re State*, 602 S.W.3d 549, 558 (Tex. 2020) (orig. proceeding).

11

we characterized the Legislature's decision to limit voting by mail to five "specific, defined categories" as "very deliberate[]".[39]

The Legislature's intent that voting by mail be the exception, rather than the rule, is evident in the Code's strict requirements for it. An eligible voter must send the early voting clerk "by mail" a written application that is "signed" by hand, not electronically.[40] The application must be "signed . . . by a witness other than the early voting clerk or a deputy", and the witness "must indicate the witness's relationship to the applicant" or state that the witness and applicant are unrelated.[41] Fraudulently submitting an application or witnessing more than one application in the same year are criminal offenses.[42]

Hollins' mass mailing of ballot applications would undercut the Secretary's statutory duty to "maintain uniformity" in Texas' elections, the Legislature's "very deliberate[]" decision to authorize only discrete categories of Texans to vote by mail, and its intent that submission of an application be an action with legal gravity.[43]

---

[39] *Id.* at 559.

[40] § 84.001(b), (d).

[41] § 84.003(a).

[42] §§ 84.004, .0041.

[43] This conclusion is strengthened by the fact that statutes in several states grant election officials express authority to dispatch unsolicited mail-in ballot applications. *See* DEL. CODE. tit. 15, § 5603; 10 ILL. COMP. Stat. 5/2B-15(b); 2019 MASS. H.B. 4820 § 6(d) (enacted July 6, 2020); N.M. STAT. § 1-12-72(D). And in other states, a statewide executive official has authorized mass mailing of applications in response to the COVID-19 pandemic. *See, e.g.*, Letter from Larry Hogan, Governor of Md., to Michael R. Cogan, Chairman, State Bd. of Elections (July 8, 2020) (directing the state board of elections to "promptly send out an absentee ballot request application to every eligible Maryland voter"); IOWA LEG. COUNCIL, MINUTES OF JULY 17, 2020 MEETING 2–6 (detailing the Legislative Council's approval of the secretary of state's request to use his emergency powers to send voters mail-in ballot applications); *Davis v. Sec'y of State*, No. 354622, Mich. App. LEXIS 6128 (Sept. 16, 2020) (holding that the secretary of state has the authority and discretion to send unsolicited mail-in ballot applications to voters).

Authority for Hollins' proposed mass mailing can be implied from the Election Code only if it is necessarily part of an express grant—not simply convenient, but indispensable. Any reasonable doubt must be resolved against an implied grant of authority. Mass-mailing unsolicited ballot applications to voters ineligible to vote by mail cannot be said to be necessary or indispensable to the conduct of early voting. Even if it could be, doubt on the matter is certainly reasonable and must be resolved against recognizing implied authority. We hold that an early voting clerk lacks authority under the Election Code to mass-mail applications to vote by mail. The State has demonstrated success on the merits of its *ultra vires* claim.

### III

The court of appeals addressed only the third element of the temporary-injunction test—irreparable injury. It held that the State had not established any injury (much less irreparable injury), reasoning in part that it was "not persuaded . . . that ultra vires conduct automatically results in harm to the sovereign as a matter of law."[44] We are. Our precedent clearly supports this rule.

In 1926, we recognized the State's "justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law".[45] That view has endured. More recently we reiterated that "[a]s a sovereign entity, the State has an intrinsic right to . . . enforce its own laws."[46] We have explained that where those laws are being defied or

---

[44] ___S.W.3d___, ___ (Tex. App.—Houston [14th Dist.] 2020).

[45] *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926) (orig. proceeding) (internal quotation marks omitted).

[46] *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015) (citing *Printz v. United States*, 521 U.S. 898, 912 n.5 (1997)).

misapplied by a local official, an *ultra vires* suit is a tool "to reassert the control of the state."[47] That tool would be useless—and our language null—if the State were required to demonstrate additional, particularized harm arising from a local official's specific unauthorized actions.

We have also said that "[a]n injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard."[48] Money damages are not available in an *ultra vires* action. As a result of sovereign immunity, the only remedies available in an *ultra vires* action are injunctive and declaratory relief.[49] The sovereign would be impotent to "enforce its own laws" if it could not temporarily enjoin those breaking them pending trial. When the State files suit to enjoin *ultra vires* action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement for a temporary injunction.

\* \* \* \* \*

We hold that the Election Code does not authorize an early-voting clerk to send an application to vote by mail to a voter who has not requested one and that a clerk's doing so results in irreparable injury to the State. We grant the State's petition for review, reverse the court of appeals' judgment, and remand the case to the trial court for entry of a temporary injunction prohibiting the Harris County Clerk from mass-mailing unsolicited ballot applications to voters.

**Opinion delivered:** October 7, 2020

---

[47] *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

[48] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

[49] *See Heinrich*, 284 S.W.3d at 368–369 ("We conclude that while governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions.").